McElroy COLLIER (Plaintiff), Respondent,

v.

ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation (Defendant), Appellant.

No. 29497.

St. Louis Court of Appeals.

Missouri.

Feb. 5, 1957.

Robert E. Staed, St. Louis, Lloyd E. Boas, St. Louis, of counsel, for appellant.

Lying, MacLeod & Davidson, Russell N. MacLeod, Edward I. Davidson, St. Louis, for respondent.

HOUSER, Commissioner.

Action for damages for personal injuries arising out of an intersectional collision between plaintiff's automobile and defendant's bus. The negligent act submitted to the jury was defendant's violation of a city ordinance by failing to stop the bus before entering an intersection in the face of an electric traffic control signal which changed from amber to red as defendant's bus was approaching and before it reached the intersection. The pleaded defense of contributory negligence submitted to the jury was plaintiff's act of starting up and driving his automobile into the bus when plaintiff saw or could have seen the danger and could have avoided the collision by remaining stationary or by stopping or slackening his speed. Defendant appeals from a judgment for $5,000 rendered upon a verdict for plaintiff, contending that plaintiff failed to prove the negligence submitted, failed to prove permanent injuries and by his own admission convicted himself of contributory negligence as a matter of law.

Plaintiff's northbound automobile collided with defendant's eastbound bus in the southeast quadrant of the intersection

of Kingshighway and Manchester Avenue in the City of St. Louis. Kingshighway runs north and south. Manchester runs east and west. Both are 50–60 feet wide. There are three eastbound traffic lanes on Manchester. The bus was running east in the right or southernmost lane. There are three northbound traffic lanes on Kingshighway. Plaintiff's automobile occupied the center lane. Electric signals control traffic at the intersection. The lighting sequence was as follows: Kingshighway, green for 40 seconds followed by amber for 8 seconds, then Manchester, green for 48 seconds followed by amber for 4 seconds. When the lights are green for north and south traffic they are red for east and west traffic. A crosswalk 8–10 feet wide runs east and west on the south side of Manchester. There is a distance of 8–10 feet from the north edge of the crosswalk to the south curb (extended) of Manchester. The eastbound bus stop for this intersection is located on Manchester, immediately east of Kingshighway. As plaintiff approached the intersection the traffic light turned red. He brought his car to a stop about 1½ feet south of the crosswalk, first in line in the center northbound lane. A vehicle (either a panel truck or a passenger car, plaintiff was not certain which) pulled up and stopped on plaintiff's left, a "little bit ahead of" him and first in line in the inside northbound lane. About 10 northbound cars stopped for the red light in the three northbound lanes. Several southbound cars on Kingshighway likewise were at a standstill, awaiting the change in the red light. The panel truck to plaintiff's left was a "dark looking object" which blocked his vision to the left. When the light for northbound traffic turned green plaintiff's car was in low gear. He started up as soon as he could. Plaintiff looked or glanced to the left side to see if anything was coming from the west. He could not see in that direction on account of the panel truck, which "went out ahead of" plaintiff "a little bit." Plaintiff glanced on ahead—looked north—and started forward. Plaintiff did not look to

the right or left after he started forward. When the light for northbound traffic turned green the driver of the vehicle to plaintiff's left, George Grand, also started forward, his front bumper 2–3 feet ahead of plaintiff's front bumper. After proceeding 5–10 feet into the intersection, Grand saw the oncoming bus out of the corner of his eye. The bus was then in the intersection, only 10–15 feet to Grand's left. Grand's car was traveling 4–5 feet in advance of plaintiff's car. Grand "slammed on his brakes" and came to a stop. The bus missed the front end of Grand's car by 6 inches or a foot. Plaintiff did not see Grand's car come to a stop. Plaintiff's car continued forward. "All of a sudden" the bus came into plaintiff's vision approaching from plaintiff's left. When plaintiff first saw the bus it was only 5–10 feet distant from plaintiff's car, the right front of the bus "almost in front of" plaintiff. At the time plaintiff first saw the bus plaintiff's car had proceeded some 5–10 feet into the intersection. The left front of plaintiff's car and the right front of the bus collided. From the position where plaintiff's car had been standing before the change in the traffic light to the point of collision plaintiff traveled from 22–31½ feet. The highest speed plaintiff's car reached in this distance was 5–10 m. p. h. At 5 m. p. h. he could stop in 10–12 feet, at 10 m. p. h. in 24 feet. As soon as plaintiff saw the bus he attempted to "throw" his foot on the brake, grab the steering wheel and swerve to the right. He thought but was not sure that he did these things. After the impact plaintiff's car came to a stop in the middle of the street 1–1½ feet east of the point of impact, headed northeast. The bus came to a stop at the bus zone 55–70 feet east of the point of impact. The speed of the bus as it proceeded across the intersection was variously estimated at 20, 30 or 40 m. p. h. The bus was 10 feet high, 8 feet wide and 35 feet long.

When the light turned green for plaintiff all of the north and southbound vehi-

cles began to move forward. Robert Easterday, whose southbound car had been first in line in the inner southbound lane on Kingshighway, proceeded forward 10 feet or so past the crosswalk lane after the light turned green. Then he noticed the bus coming from the west (his right). He "slammed on his brakes" and came to a stop north of the line of travel of the bus and some 10–20 feet from the place from which he started. The bus passed 15–20 feet in front of him after Easterday's car had stopped. Irving A. Campbell was driving the car immediately behind plaintiff. When the light for northbound traffic turned green Campbell started his car forward. Campbell noticed that traffic headed west on Manchester was "piling up, stopping at the sign." After the light for northbound traffic turned green and after the north and southbound traffic had started to move forward Campbell first saw the bus, which at that time was in the middle of the street. The bus "appeared rather suddenly right in front of the middle of all this traffic." Campbell had gone about 5–6 feet when the bus crossed in front of plaintiff's car. The bus was higher than plaintiff's car, and Campbell's view of the bus was not obscured. Dr. Norman Orgel was driving in the center lane for northbound traffic about 3, 4 or 5 cars behind plaintiff. "A little while" after the light for northbound traffic turned green all the cars in Dr. Orgel's lane, including plaintiff's, started forward very slowly. The doctor looked up "on a slant" and saw the bus coming through from the west. He saw the bus before it reached the intersection. It passed into his vision "from the corner." When the bus passed the corner the green light was in favor of northbound traffic, according to Dr. Orgel. As the eastbound bus went through the intersection there was no westbound traffic on Manchester. Dr. Orgel had no trouble seeing the bus over the top of the cars. James Garber, a passenger on the bus, testified for plaintiff that the bus did not stop before entering Kingshighway but crossed the intersection at about 25 m. p. h.; that the traffic light

changed from green to amber; that when the bus entered the intersection the light was amber; that the light changed from amber to red when the bus was "right in the middle of the intersection." He said that the bus "had got pretty well across Kingshighway intersection when the light changed to red."

On behalf of defendant the bus driver, Gabriel Shoults, testified that he approached the intersection at 20 m. p. h.; that when the bus was 50 feet west of the intersection the light for eastbound traffic was green; that when the bus was 20–25 feet west of the intersection the light had changed from green to amber; that an eastbound passenger car traveling at about the same speed as the bus and preceding the bus by 15–20 feet stopped before entering the intersection; that when the amber light came on Shoults did not stop but proceeded through the intersection; that when the bus reached the west curb line of Kingshighway the light was still amber; that when he went into the intersection the light was still amber; that the light turned red when the bus was "about the center of the street," i. e. when the front end of the bus was "just about the middle of Kingshighway;" that the cars in the northbound lane were stationary when the front of the bus passed in front of them; that thereafter plaintiff's car moved forward and struck the right rear wheel of the bus.

◼ Defendant's first point is that plaintiff failed to prove the only negligent act submitted, i. e. that defendant entered the intersection in the face of a red light. Defendant asserts that the only witness produced by plaintiff who testified concerning the condition of the light was James Garber and that he testified positively and unequivocally to the contrary, namely, that the light was *amber* when the bus entered the intersection and that it did not turn red until the bus had reached the middle of Kingshighway. Defendant claims "there is no evidence in the record that the bus entered

the intersection after the eastbound light showed red." Plaintiff is not conclusively bound by any unfavorable testimony given by the witness James Garber if his testimony was contradicted either expressly or by inference by other testimony or circumstances from which the jury could have disregarded Garber's testimony and could have drawn the inference that the light for eastbound traffic was red before the bus reached the west curb line of Kingshighway. De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628, loc. cit. 634. Such other evidence is to be found in the testimony of Dr. Orgel, and in the circumstances, speeds and distances testified to by several witnesses. Dr. Orgel testified that he saw the bus before it entered the intersection, after the green light came on for northbound traffic; that he looked "on a slant" and saw the bus as it "passed the corner;" that when the bus "passed the corner" the green light was in favor of northbound traffic. A traffic engineer testified that when the lights are green for north and south traffic the lights for east and west traffic would be red. From the testimony of plaintiff the jury could infer that several seconds elapsed from the time the light for northbound traffic turned green to the time of the impact—an elapsed time which, considering the speed of the bus, was sufficient to place the bus a considerable distance west of the west edge of Kingshighway at the time the light for eastbound traffic turned red. Time for plaintiff to have traveled 22–31½ feet at 5–10 m. p. h. must be allowed. Averaging the speeds of plaintiff and the bus at 7.5 m. p. h. and 30 m. p. h., the two vehicles were traveling 11.25 and 45 feet per second, respectively. It took plaintiff from 1.95 to 2.8 seconds to travel the distance from a stationary position to the point of impact. Reaction time, that is to say, time for motorists to react to the change in the light, engage their gears and start forward, should be added to these calculations, but there was no evidence as to reaction time. Figuring the speed of the bus at 30 m. p. h. and completely discounting the element of reaction time, the bus was from 87¾–126 feet west of the point of impact at the time the light for eastbound traffic turned red. Either figure places the bus considerably west of the west line of Kingshighway at the time the light for eastbound traffic turned red. Even if the jury accepted the bus driver's estimate of 20 m. p. h. the bus would have been 58½–84 feet west of the point of impact or at least 8½ feet west of the west edge of Kingshighway at the time the light turned red. A review of the testimony of the witnesses Grand, Easterday, Campbell and Orgel confirms our view that there was ample evidence from which the jury could find that several seconds elapsed from the time the light changed until the impact occurred. The first point must be ruled against defendant. This ruling necessarily disposes of the related point raised by defendant that it was error to give Instruction 1, based as it was upon a finding that the bus entered the intersection on a red light.

Defendant's next point is that plaintiff should be convicted of contributory negligence as a matter of law by his own admission that he failed to look and failed to see the bus proceeding through the intersection when it was open and obvious and was seen by all others similarly situated. Defendant claims that under § 304.010 RSMo 1949, V.A.M.S., plaintiff owed a duty at all times and under all circumstances in the exercise of the highest degree of care to look both laterally and ahead as he drove into the intersection. The question is whether, considering the evidence in the light most favorable to plaintiff, the trial court should have ruled plaintiff guilty of contributory negligence as a matter of law. Was plaintiff so completely indifferent to danger that reasonable minds could not differ on the question?

It is the duty of a motorist entering an intersection to exercise the highest degree of care and to maintain a careful and vigilant lookout ahead and laterally

ahead. Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73; Weis v. Melvin, Mo.Sup., 219 S.W.2d 310. A green light does not relieve a motorist of this duty nor does it confer an absolute right to proceed across the intersection regardless of the movement of other traffic. He cannot rely solely on the favorable signal or drive blindly into the intersection without looking. 60 C.J.S., Motor Vehicles, § 360b., p. 855. The duty of care, however, is commensurate with the circumstances. Patton v. Hanson, Mo.Sup., 286 S.W.2d 829. A motorist favored with a green traffic signal has the right to assume that non-emergency vehicles approaching on the intersecting street will obey the red light and come to a stop, and to rely upon such assumption until and unless he knows or by the exercise of the highest degree of care should know that the cross traffic is not going to obey the red light but intends to proceed into and across the intersection without stopping. Griffith v. Delico Meat Products Co., 347 Mo. 28, 145 S.W.2d 431; American Automobile Ins. Co. v. United Rys. Co. of St. Louis, 200 Mo.App. 317, 206 S.W. 257; Pfiffner v. Kroger Grocer & Baking Co., Mo.App., 140 S.W.2d 79; Annotation—Liability for Accident at Street or Highway Intersection as Affected by Reliance upon or Disregard of Traffic Sign, Signal or Marking, 164 A.L.R. 8, loc. cit. 64; 60 C.J.S., Motor Vehicles, § 361, p. 863. There is no evidence that the bus driver blew his horn or that any audible warning of the approach of the bus was sounded, or that anything occurred to bring such knowledge, actual or constructive, to plaintiff in time for plaintiff to take effective action to avoid a collision. Reasonable minds could conclude that plaintiff had the right to assume that no bus would be operated through the red light and across the busy intersection and into his path. Notwithstanding plaintiff's right to rely on the assumption, are we to say as a matter of law that plaintiff had no right to proceed because of the obstruction of his view? We think not. Where two vehicles traveling in the same direction in parallel traffic lanes come to a stop in obedience to a red electric traffic signal in such a position that the lateral view of one of them is obstructed by the other the law does not require the motorist whose view is obstructed to remain stationary when the electric signal turns green and wait until the traffic clears and his lateral view becomes unobstructed, Rea v. Pittsburgh Railways Co., 344 Pa. 421, 25 A.2d 730, nor is he obliged to get out of his car and proceed ahead on foot to see if the intersection is clear. Pellegrini v. Coll, 133 Pa.Super. 294, 2 A.2d 491. Such a requirement would create more problems than it would solve and would seriously interfere with the usefulness and purpose of multiple traffic lanes. When the light for northbound traffic turned green plaintiff had a right to proceed forward into the intersection, provided he did so with caution, maintained a vigilant lookout ahead and laterally for whatever could be seen under the circumstances, and in the operation of his car exercised the highest degree of care commensurate with the circumstances. See Moore v. Fitzpatrick, Mo.App., 31 S.W.2d 590. Reasonable minds, taking into consideration the following facts, could have concluded that plaintiff exercised the required degree of care in proceeding into the intersection: Plaintiff's car was first in a long line of traffic headed north. Plaintiff had the benefit of the favorable green light. Plaintiff looked to his left, albeit his view was obstructed. All of the other north and southbound traffic, including the vehicle to plaintiff's left (the driver of which had an unobstructed view to his left), started moving into the intersection. Plaintiff looked to the north. Plaintiff started out very slowly, and apparently with caution. Plaintiff did not attempt to pass the vehicle to his left or to "get ahead of the pack." Plaintiff at no time attained an excessive speed, but proceeded at a very modest speed. By the time the bus came into plaintiff's view it was too late for plaintiff to take effective action to avoid a collision. On this record we cannot say as a matter of law that plaintiff was guilty

of contributory negligence. Pfiffner v. Kroger Grocer & Baking Co., supra; American Automobile Ins. Co. v. United Rys. Co. of St. Louis, supra; Pellegrini v. Coll, supra; Rea v. Pittsburgh Railways Co., supra; Myers v. Funk, 111 Pa. Super. 17, 169 A. 400; Harris v. Moran, 121 Pa.Super. 16, 182 A. 660.

The fact that the bus was seen by witnesses Campbell, Orgel, Grand and Easterday and not by plaintiff does not convict plaintiff of contributory negligence in failing to see the bus. Each of the named witnesses was in a different and doubtless more advantageous position to see than plaintiff, whose view, according to his testimony, was completely blocked in the position he occupied.

We have considered the cases of Folluo v. Gray, Mo.App., 256 S.W.2d 273; Frandeka v. St. Louis Public Service Co., Mo. Sup., 234 S.W.2d 540; Burton v. Moulder, Mo.Sup., 245 S.W.2d 844, and the other cases cited by defendant, but they are so different on the facts that they are not persuasive here.

Finally, defendant asserts that the court erred in submitting permanent injuries for the reason that there was no substantial evidence thereof. This point must be disallowed in view of the testimony of Dr. Hall that he did not think plaintiff's enlarged inguinal ring will improve or that plaintiff's shoulder "will ever be where he has no trouble with it. I think he has a congenitally weak shoulder that has been injured. The shoulder is held together with tendons and fascia and muscles; * * * I think he has pulled some of these apart and I don't think his shoulder will ever be that he don't have trouble with it. * * * The injury naturally weakened the shoulder and after ten months he still complains after treatment." Defendant excepts to the use by the doctor of the term "think" but defendant's counsel proposed the word in his question when he asked the doctor to tell the jury "what conditions

you think that he has now" that will not clear up. It is obvious that the word "think" as used by the doctor indicated the formation of a judgment or opinion within the meaning of the ruling in Bohn v. City of Maplewood, Mo.App., 124 S.W.2d 649, and Schubert v. Oswald & Hess Co., 161 Pa.Super. 309, 54 A.2d 113, and that his answer using that term should not be rejected as without probative force within the rule announced in Armstrong v. Croy, Mo.App., 176 S.W.2d 852.

The Commissioner therefore recommends that the judgment of the circuit court be affirmed.

PER CURIAM.

The foregoing opinion of HOUSER, C., is adopted as the opinion of the court.

The judgment of the circuit court is, accordingly, affirmed.

RUDDY, Acting P. J., MATTHES, J., and SAM C. BLAIR, Special Judge, concur.