Viola **WILLIAMS**, Plaintiff-Respondent,

v.

Betty **FUNKE**, Defendant-Appellant.

No. 32330.

St. Louis Court of Appeals.

Missouri.

April 16, 1968.

Motion for Rehearing or to Modify or to Transfer to Supreme Court Denied May 14, 1968.

Dorsey & Aulbert, G. M. Dorsey, Leritz & Leritz, J. D. Leritz, St. Louis, for appellant.

Donald S. Hilleary, Clayton, for respondent.

TOWNSEND, Commissioner.

The parties to this action, drivers of their respective automobiles, were involved in a collision on Union Boulevard in the City of St. Louis at a point where a westbound ramp leading upward from Highway I–70 debouches into Union Boulevard. The front end of plaintiff's automobile struck the right front side of defendant's car with resulting personal injuries to both parties. Each

party testified that the controlling traffic light was green in her favor at the time of impact.

Plaintiff's petition, seeking a recovery for her personal injuries only, founds her claim of defendant's negligence upon failure to keep a careful lookout ahead and laterally, excessive speed, failure to give any sound or other warning and violation of the red light of the electric traffic signal controlling the movement of traffic on Union Boulevard. Defendant's answer consisted of a general denial and an allegation of plaintiff's contributory negligence. Defendant filed her counter-claim seeking a recovery for personal injuries which she sustained allegedly as a result of plaintiff's negligence. Each party also pleaded humanitarian negligence.

A verdict and judgment for $4800 was given for plaintiff on her petition and for plaintiff on defendant's counter-claim.

Union Boulevard is a major traffic artery running generally southwest and northeast. In the vicinity of the place of collision, Highway I–70 runs in a depression and Union Boulevard crosses over I–70 on a viaduct. The ramp upon which plaintiff had been traveling, designated as Ramp J–1, runs in a generally westward direction for a distance of six hundred feet from the point where it leaves I–70 to the junction with Union Boulevard. This ramp has two lanes, each marked with an arrow in the pavement—one designating a left turn into Union Boulevard and one indicating a right turn into Union Boulevard.

A plat of the general area, prepared by Mr. Bilhorn, a professional engineer, shows that there is an eastbound ramp parallel with and 45 feet south of the westbound ramp, running downward to I–70. Plaintiff's photographic evidence shows that, between the two ramps, there is an open area directly above the eastbound portion of I–70. The open space ends with a curved concrete wall abutting on Union Boulevard. Along each side of each ramp is a con-

crete retaining wall surmounted by vertical interspersed devices which support a horizontal tubular rail; on the south side of the westbound ramp this retaining wall arrangement runs all the way to the curved concrete wall abutting on Union Boulevard.

To the west of Union Boulevard and parallel to it is a paved road by which traffic is brought from the west and northwest and given access to Union Boulevard at a point approximately 200 feet southwest of the scene of collision; access to Union Boulevard on this road is controlled by a traffic light at that point—200 feet southwest of the scene of collision. The access road is separated from Union Boulevard by a concrete strip about five feet wide.

Plaintiff's evidence shows that there is a traffic control signal at the intersection of Bircher Boulevard and Union Boulevard, which is located about 250 feet south of the collision point.

Plaintiff's plat shows an electrical signal at the curved wall which separates the two ramps. The photographic evidence shows that this signal overhangs that wall. Mr. Bilhorn testified that the function of that light is to stop traffic on Union Boulevard "to clear [westbound] Ramp J–1".

The plat and the photographic evidence show also that on the right side of the westbound ramp, about 20 feet back from Union Boulevard, there is another traffic control signal, whose purpose according to Mr. Bilhorn was to control traffic moving westwardly on "Ramp J–1". This signal has a red light at the top, a yellow light in the middle and at the bottom a left turn arrow and a right turn arrow; "it shines only back for oncoming traffic on Ramp J–1".

Directly opposite the junction of Ramp J–1 and Union Boulevard and on the west side of Union Boulevard is another series of traffic signal devices; the perpendicular standard carrying these devices sits in the concrete strip between Union Boulevard and the access road, and does not overhang

Union Boulevard. That part of this series which faces eastward toward Ramp J–1 has a red light at the top, yellow in the middle and at the bottom both left turn and right turn green arrows. Mr. Bilhorn stated that these lights were a duplication of those on the ramp, last previously described.

■ We review the evidence from a standpoint favorable to plaintiff, give her the benefit of any part of the defendant's evidence favorable to her and not contradicted by her own testimony or not contrary to her fundamental recovery theory, give her the benefit of the reasonable inferences from all the evidence, and disregard all of defendant's evidence unfavorable to plaintiff. Terminal Warehouses of St. Joseph, Inc. v. Reiners, Mo., 371 S.W.2d 311; Sperry v. Tracy Dodge-Plymouth Co., Mo., 344 S.W.2d 108; Brantley v. Couch, Mo.App., 383 S.W.2d 307.

Plaintiff testified that she drove up the ramp in the left lane with the intention of turning left into Union Boulevard at the top of the ramp and that as she approached Union Boulevard she "never saw any traffic coming from the south", that the railing on the left side of the ramp "does bother me every time I come up that ramp * * it does yet". She confirmed that at the time her deposition was taken the following question was asked and her answer given:

"As you are entering Union Boulevard is there anything to obstruct your view looking to the left? A. Yes; the rails of the ramp."

When plaintiff arrived at a point 25 to 30 feet from Union the traffic light on the west side of Union facing Ramp J–1 changed, displaying to her green arrows pointing both right and left. At that time she was moving at a rate of 10 to 15 miles per hour. She then proceeded on and had entered Union when she looked to the south for the first time—"When I turned my gaze to the south straight I was—there was an impact." And so the collision occurred in the east curb lane of Union for northbound traffic.

Officer Mitchell, who had police jurisdiction over the locale at the time of the collision, testified that the control lights at the site are in charge of the State and that the city has no jurisdiction over them. He stated that the traffic light at the south end of the viaduct and the one overhanging the curved wall between the two ramps "on different occasions will, work in conjunction at some time" and that the coordination of these lights is determined "by the flow of the traffic by these particular type lights". Upon cross-examination he testified:

"Q. Do you know whether or not this light standard, the one between the eastbound exit ramp and the westbound entrance ramp is synchronized with the one opposite the westbound exit ramp and the one at the beginning or east side of Union?"

A. They are synchronized in that respect.

Q. In other words, if they weren't synchronized, we could have a terrible thing out there, couldn't we?

A. That's correct.

Q. So based on your experience and knowledge, when the light here and the light here (indicating) for a person going west reads green arrows left and right, this light (indicating) reads red; is that correct?

A. That's correct."

■ Plaintiff's instruction No. 8 instructed the jury that its verdict must be for plaintiff if defendant either violated the traffic signal or failed to keep a careful lookout. Defendant's first major point is that there was no substantial evidence that defendant violated the traffic signal. It is true that there is no direct testimony that defendant "ran a red light". Plaintiff's testimony was that at the moment of making her turn from the ramp into Union the light facing eastward toward the exit from the

ramp showed green arrows both right and left. The police officer, familiar with the locale testified that the different lights at the scene are synchronized and that when the lights directed at the traffic emerging from the ramp are green the other light controlling northbound traffic on Union is red. From this evidence the jury might reasonably infer that, when plaintiff emerged from the ramp with her controlling light green in her favor, the other light on the east side of Union between the two ramps and controlling northbound traffic on Union read red and so find that defendant violated the latter traffic signal.

■ Mr. Bilhorn testified that the height of plaintiff's automobile, a 1957 Oldsmobile, was approximately five feet—from the top of the car down to the pavement, and that the eye level of a person in that vehicle would be from four feet to four feet two inches above the pavement. He stated that the eye level of a person in defendant's automobile, a 1963 Buick Special Convertible, would be about three feet nine inches. Mr. Bilhorn testified further that the top of the railing on the east side of Union between the two ramps was three feet above the surface of the pavement, but a five foot portion of the railing near the J–1 ramp exit is three feet six inches in height; such is the only sight barrier to the east for a person proceeding northward on Union. Question and answer follow:

"Q. He has taken 3½ inches off of the top of the [Buick] automobile. Does that change your opinion as to whether or not the person operating that automobile, by looking to their right, would be able to observe westbound traffic on the right?

A. In my opinion, each could see the other."

Under cross-examination relating to her ability to see to her right in the vicinity of the ramps, defendant gave the following testimony:

"Q. You think your eye level is lower than 3½ feet above the surface of the road?

A. No, I said about 3½ feet.

Q. If you strained them, you could see the top of the vehicle [coming up the ramp], could you not?

A. Yes, sir."

We believe that there was sufficient evidence to justify the inclusion in plaintiff's instruction No. 8 of the hypothesization of failure to keep a careful lookout.

■ Defendant next contends that plaintiff was guilty of contributory negligence as a matter of law in entering upon Union Boulevard without looking for northbound traffic coming from the south and for failing to see defendant's automobile. While there is considerable testimony as to the inability of each party to see over the relative adjacent railing and while there is unclear testimony open to more than one interpretation, that plaintiff was "glancing both ways", we think the record is clear that plaintiff admitted that the first time she looked to the south (her left) was when she was in Union. By this admission she acknowledged her failure to comply with the requirement of maintaining a lookout laterally. The crucial question then is whether under the circumstances this omission on her part conclusively established her negligence. We believe that ordinarily the driver at a junction or intersection who finds his controlling traffic light green in his favor is entitled to assume that cross traffic which is normally controlled by another known light at the junction or intersection is interdicted and that his own progress across or into the junction or intersection is sanctioned, unless he knows or should know of conditions which would indicate to a driver exercising the highest degree of care that such progress was dangerous either to the driver or to others. Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455. Hence here the question of whether the plaintiff was negligent in

driving into the junction is a question of fact to be answered by the jury. It cannot be said to be contributory negligence as a matter of law.

## Humanitarian Negligence

The requirements for the submission of an issue of humanitarian negligence have been so frequently stated that we do not repeat them in detail. We are here concerned first with the basic elements of (1) plaintiff's position of peril and (2) defendant's notice of that perilous position, constructive notice being sufficient if defendant has the duty of maintaining a careful lookout. Plaintiff's verdict-directing instruction No. 5 hypothesized that plaintiff was in a position of immediate danger of being injured and was injured, and that defendant knew or by using the highest degree of care could have known of such position of immediate danger. When did plaintiff under the evidence here adduced, enter the danger zone?

■■■ It is obvious that the parties to this action were traveling on what may be called collision courses, because it is clear that given certain conditions of distance and speed they must inevitably collide. And so as plaintiff approached Union Boulevard at some point she entered a zone where there was immediate danger of being injured in a collision with defendant's automobile. The reports are replete with enunciations of the rule that when and where a person comes into a position of imminent peril is a question for the jury under the evidence. See Wyckoff v. Davis, Mo., 297 S.W.2d 490. Where the plaintiff is apparently oblivious of his danger the zone of imminent peril extends beyond the immediate course being pursued by the defendant. Harrington v. Thompson, Mo., 243 S.W.2d 519; Alexander v. Kansas City Public Service Co., Mo.App., 268 S.W.2d 451. "Thus, in any humanitarian case wherein *obliviousness* is relied upon to create a position of imminent peril, beginning

an undetermined distance from the path of a moving instrumentality, and wherein there is evidence from which a jury may reasonably find that at some place during an approach to the path of the moving vehicle a plaintiff came into and was in a position of imminent peril, the particular place where, and time when, he did come into and was in such position, is for the jury to determine." Harrington v. Thompson, supra, 243 S.W.2d at 525. In view of her reliance upon the green arrows it is plain that plaintiff was oblivious of the peril of collision with defendant's automobile.

When could defendant have discovered plaintiff's position of peril? The distance between the two ramps is 45 feet. When defendant arrived at the midpoint of the entrance to the eastbound ramp, J–2, her car would have been approximately 55 feet south of the south line of ramp J–1, according to plaintiff's plat, Ex. 1. We think that a jury could find from defendant's photographic exhibit I that at this point defendant in the exercise of the highest degree of care could have seen plaintiff's car moving westward on ramp J–1. The view from this point—the midpoint of the entrance to ramp J–2—would have been northeastward and in that direction of sight the wall along each ramp was three feet high. That direction of sight would have been far short (or eastward) of that portion of the curved wall abutting on Union. As defendant's eye level was three feet nine inches, a jury could find that plaintiff's approach to Union was, with the exercise of care, discernible by defendant from that midpoint. We are fortified in this conclusion by the fact that plaintiff's automobile stood five feet high above the level of the ramp pavement or two feet higher than the railing at the south side of ramp J–1. In addition, Mr. Bilhorn, an engineer experienced in traffic and motor-training offices, stated it as his opinion that each driver could see the other. We think also that at this point defendant could have seen that plaintiff was oblivious of

any peril of collision with a car from her left—plaintiff was proceeding uninterruptedly toward the junction at a speed that varied only slightly (if at all) from 15 miles per hour in the last 100 feet to the junction and she was proceeding toward a green control light, a matter of which defendant would have been aware if she had maintained the proper lookout forward. Plaintiff's position of peril was discoverable and plaintiff's obliviousness of peril was apparent to one in the position of defendant exercising the highest degree of care.

 Under the humanitarian doctrine the duty of the defendant to act depends of course upon notice of the plaintiff's perilous position. It has been stated, and reiterated numerous times, that where there is a duty of the defendant to be on lookout, constructive notice suffices for the application of the doctrine. See Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482; Price v. Nicholson, Mo., 340 S.W.2d 1; Melton v. St. Louis Public Service Co., 363 Mo. 474, 251 S.W.2d 663. As stated in De Lay v. Ward, Mo., 262 S.W.2d 628, 634: " * * * we have, at places where there is a duty to keep a lookout, extended the humanitarian rule to discoverable as well as discovered peril * * * under the discoverable peril theory a defendant is charged with seeing what he could have seen whether he looked or negligently failed to look."

 Defendant testified that she was proceeding northward along Union at 20 miles per hour. Mr. Bilhorn testified that the total stopping distance of a 1963 Buick in good condition on a level dry pavement, traveling at 20 miles per hour, "would be approximately 22 feet for perception reaction, and about 18 feet for braking time, for a total of 40 feet" with reasonable safety to the operator. It is thus clear that when defendant, charged with the duty of keeping a lookout, reached the midpoint of the entrance to eastbound Ramp J–2 she could have, in the exercise of the highest degree of care, seen plaintiff proceeding westward on Ramp J–1, and that thereafter by the use of the means available to her and with reasonable safety have stopped her car ten to fifteen feet short of the point of impact.

 Defendant complains that the verdict is so excessive as to indicate bias and prejudice on the part of the jury. This assignment of error was presented to the trial court in the motion for new trial and was overruled. The fixing of a successful plaintiff's damages involves essentially a question of fact for the jury, the finding of which is always subject to the supervisory power of the trial court to determine whether or not the verdict is against the weight of the evidence. When the trial court has had that question presented to it in a motion for new trial and has answered it by its denial of the motion it is not normally the function of an appellate court to enter upon a new consideration of the question unless there is a clear showing of abuse of discretion by the trial court. "The question of the amount of an award of damages is primarily for the jury. * * * it was the peculiar province of the jury on the trial and of the trial court on motion for a new trial to pass upon the credibility of the witnesses and weigh the evidence, and our appellate courts do not ordinarily weigh the evidence in an action at law wherein the factual issues have been submitted to a jury." Polizzi v. Nedrow, Mo., 247 S.W.2d 809, 811. Not that the appellate court does not have the reviewing power—"such [cited] decisions mean only that appellate courts *will* not interfere with the trial court's ruling unless it has arbitrarily or abusively exercised its discretion. The reason is that the trial court has a better opportunity to sense the trial atmosphere, confront the witnesses and consider unrecordable evidences of what the truth more probably is—things which appellate courts usually cannot glean from the cold record * * *. In other words, it is not a question of jurisdiction but of *policy*." King v. Kansas City Life Insur-

ance Co., Mo., 164 S.W.2d 458, 464. (Emphasis that of the court).

 Independent of the principles above stated, we could not hold that the verdict herein was excessive even if we treated the matter wholly de novo. There was evidence that plaintiff's medical and hospital expenses resulting from the incident exceeded one thousand dollars * and that she suffered a loss of wages of four hundred dollars. Plaintiff was rendered unconscious by the collision. Her physician has diagnosed a cerebral concussion and recurrent cervical strain, with a limitation of motion. Starting with the week following the collision plaintiff has suffered recurrent headaches, continuing up to the time of trial. Her physician attributes these headaches in part to the concussion and in part to the cervical strain. During a two weeks stay in one hospital plaintiff was periodically put into traction and received heat treatments. Thereafter her physician prescribed a cervical collar to relieve the neck condition and she wore it off and on for a period of about six months. The medical report expresses the opinion that "the major portion of the headaches come from the trigger effect of cervical pain" and that "The cervical strain falls into the recurrent category because of the time interval and will bother the patient off and on the remainder of her life." For relief of the headaches plaintiff takes bufferin throughout the day but such medication never completely kills the pain. Plaintiff testified that before the accident, in her employment in a nursing home, she was regularly engaged in lifting patients with only infrequent pain; since the accident she cannot lift them without help because of the pain. She can no longer bowl.

The verdict was not shown to be excessive.

The judgment is affirmed.

* Paid bills put into evidence totalled $525.-85. We find that another bill for $551, as to which plaintiff made an offer of

PER CURIAM:

The foregoing opinion by TOWNSEND, C., is adopted as the opinion of this Court. Accordingly, judgment is affirmed.

ANDERSON, P. J., and WOLFE, J., and GEORGE W. CLOYD, Special Judge, concur.

proof, was properly admissible under Cordray v. City of Brookfield, Mo., 88 S.W.2d 161.