Barbara EULER, Plaintiff-Respondent,

v.

William E. SCHULTHES, d/b/a Santa Fe Cab Company, Defendant-Appellant,

and

George R. Betancourt, Defendant.

No. KCD 26726.

Missouri Court of Appeals, Kansas City District.

March 31, 1975.

James Horn, Edward Sheppard, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for defendant-appellant.

Richard W. Mason, St. Joseph, for plaintiff-respondent.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

In this jury tried action for damages resulting from an intersection vehicular collision in Kansas City, Missouri, on May 23, 1972, plaintiff, Barbara Euler, received a verdict in the amount of $3,500.00 against defendant William E. Schulthes, d/b/a Santa Fe Cab Company. The jury returned a verdict in favor of defendant George R. Betancourt. Schulthes appealed. Plaintiff did not appeal from the verdict rendered in favor of Betancourt.

The issue posed by Schulthes on appeal, primal as it may be, is one that does not lend itself to a quick or easy resolution. Did the plaintiff make a submissible lookout case against Schulthes? Parenthetically, plaintiff submitted her case to the jury against both defendants on the sole ground that each "failed to keep a careful lookout".

Ascertainment of whether the evidence in a given situation is sufficient to support a submission of negligence is subject to the established principle that a plaintiff is entitled to the benefit of all favorable evidence and all favorable inferences therefrom, regardless of the introductory source, party-wise, of such evidence. However, there is an equally well established qualification to the principle just mentioned. A plaintiff is not entitled to the benefit of evidence which is at variance with his unequivocal personal testimony as to the matters other than mere estimates or opinions, or which is at war with his own theory of the case. Hecker v. Schwartz, 426 S.W.2d 22 (Mo.1968), and Anthony v. Morrow, 306 S.W.2d 581 (Mo.App.1957). A congruent review of the evidence, interspersed with interpolations of applicable substantive law, discloses the following facts from which submissibility must be determined.

On the evening of May 23, 1972, around "dusk", plaintiff was a passenger in a cab owned by appellant Schulthes (the driver of the cab did not appear or testify at the trial). The cab was traveling north on Washington Street in Kansas City, Missouri, approaching an intersection formed by Washington Street and Eleventh Street. Washington was a four-lane, "one-way" street limited to northbound traffic. Eleventh was a four-lane, "one-way" street limited to westbound traffic. The intersection was controlled by a "stop and go" traffic signal light. The cab was northbound in the second lane east of the west curbline. The record is silent as to the make, model and vintage of the cab. The other vehicle involved, a 1970 Toyota operated by George R. Betancourt, was westbound on Eleventh Street, in the second lane north of the south curbline and approaching the intersection. Even the most cursory review of plaintiff's testimony reveals that she was quite adamant, and testified in a positive, unequivocal manner, that the cab had the "green" or "go" light as it approached and entered the intersection, and, as well, at the time the collision occurred. Plaintiff is bound by and irrevocably committed to her positive unequivocal testimony that the "green" or "go" light favored the cab at all time. Hecker v. Schwartz, supra; Burris v. Kansas City Public Service Co., 226 S.W.2d 743 (Mo.App.1950), and Mollman v. St. Louis Public Service Co., 192 S.W.2d 618 (Mo.App.1946).

■■ The driver of the cab, favored as he was with the "green" or "go" light, had the right to assume that Betancourt would obey the traffic signal light and come to a stop before entering the intersection. The driver of the cab had the further right to rely upon this assumption until he knew or by the exercise of the highest degree of care should have known that Betancourt did not intend to obey the traffic light, but instead intended to proceed into and across the intersection without stopping. Coulter v. Bi-State Development Agency of Mo.–Ill. Met. Dist., 434 S.W.2d 793 (Mo.App.1968); Williams v. Funke, 428 S.W.2d 11 (Mo.App. 1968); Collier v. St. Louis Public Service Co., 298 S.W.2d 455 (Mo.App.1957). Although plaintiff, absent any indication as to the location of the cab with respect to the intersection or any other fixed reference point, testified that she saw the Betancourt vehicle "before the actual impact" at which time it was "supposedly" stopped, her testimony in this respect was clearly equivocal and therefore nonbinding upon her. Smith v. Siercks, 277 S.W.2d 521 (Mo.1955); Burris v. Kansas City Public Service Co., supra. Consequently, one is relegated to searching the record to ascertain whether evidence exists as to when the cab driver's right to rely upon the assumption that Betancourt would obey the traffic signal light terminated. The only evidence touching upon this crucial determination is found in Betancourt's tesimony. He testified that when he was "four or five car lengths" east of the intersection he observed the cab, at which time the cab was approximately "half a block" away or "half ways up the street". If judicial notice is taken that a city block is approximately three hundred feet in length, Lilly v. Boswell, 362 Mo. 444, 242 S.W.2d 73[4] (1951); Hamell v. St. Louis Public Service Co., 268 S.W.2d 60[1] (Mo. App.1954), the import of Betancourt's testimony is that the cab was approximately one hundred fifty feet "up the street" at the time his vehicle was "four or five car lengths" east of the intersection. At this point of time Betancourt variously described his vehicle as traveling approximately ten miles an hour or "going real slow", and he estimated the speed of the cab at the same point of time as being approximately forty miles per hour. Plaintiff, absent specificity as to point of time or as to the cab's position regarding either the intersection or the point of impact, or any other fixed reference point, estimated the speed of the cab at approximately twenty-five miles per hour. Betancourt further testified that he watched the cab for a period of time during which interval the cab traveled about "one-third" of the distance spanned by its original position when first observed by him and the intersection. During the same interval Betancourt testified that his vehicle traversed a distance of approximately "two car lengths". At this latter juncture of time the cab was approximately one hundred feet south of the intersection and the Betancourt vehicle was still approximately two or three car lengths east of the intersection and approaching it "real slow" or at a speed of approximately ten miles per hour. The relative positions of the cab and the Betancourt vehicle with respect to each other, or with respect to any other fixed reference point, are thereafter unaccounted for, until according to the testimony of plaintiff, "we were crossing the intersection and he [Betancourt] came across there like a bat out of Hades". Regressing to the relative positions of the Betancourt vehicle and the cab when last observed by Betancourt prior to entering the intersection and taking cognizance of the fact that both vehicles were intervisible at the time, can it be said that the cab driver at that time knew or in the exercise of the highest degree of care should have known that Betancourt was not going to obey the traffic signal light? This court believes not because the Betancourt vehicle, still approximately two or three car lengths from the intersection, was traveling "real slow" or at a speed of approximately ten miles per hour and there was absolutely nothing regarding Betancourt's operation of the vehicle, prior to the time it entered the intersection, to indicate that Betancourt was not going to obey the traffic signal light.

Risking repetition for the sake of emphasis, the relative positions of the cab and the Betancourt vehicle with respect to each other, or with respect to any fixed reference point whatsoever, are unknown, either (1) as to when the jury could have reasonably found that the cab driver knew or in the exercise of the highest degree of care should have known that Betancourt was not going to obey the traffic light or (2) when the Betancourt vehicle entered the intersection.

Betancourt testified that when he was in the middle of the intersection he heard the "noise of brakes" and glanced to his left and saw the cab, but, due to the accelerative nature of the circumstances, was unable to fix the cab's position at that time. There was also evidence of the existence of skid marks at the scene attributed to the cab, which were described by one witness as being approximately forty-five feet in length and by another witness as being approximately two car lengths long. However, there was no evidence definitively locating the skid marks purportedly made by the cab. The point of contact between the two vehicles was the left front corner of the cab and the left rear side of the Betancourt vehicle. The record is silent as to where in the intersection the point of impact occurred.

The record in this case is notable, not for what it discloses, but for what it fails to disclose. In addition to vital evidentiary voids heretofore noted, the record is silent as to the mechanical condition of the cab, dimensions of either the intersecting streets or of the intersection where the collision occurred, stopping distances, the existence of other traffic on Washington Street ahead of, behind, or to either side of the cab, or as to the distance or length that Betancourt had reference to when he spoke in terms of car lengths.

As previously noted, there is a void in the record as to the relative positions of the cab and the Betancourt vehicle with respect to each other, or with respect to any other fixed reference point, at either of the two critical time periods affecting submissibility, (1) when the Betancourt vehicle entered the intersection or (2) when the cab driver knew or in the exercise of the highest degree of care should have known that the Betancourt vehicle was not going to obey the traffic signal light. The dual void mentioned renders plaintiff's case fatally defective. Evidence of time, distance, means and ability in this case was mandatory since submissibility predicated on the cab driver's failure to keep a lookout required evidentiary support from which the jury could find that the cab driver, after he knew or in the exercise of the highest degree of care should have known that there was danger of a collision, had the time, distance, means and ability to have avoided the resultant collision. Such evidentiary support was essential to show that the charged negligence, failure to keep a lookout, constituted the proximate cause of the collision. Proof of failure to keep a lookout, standing alone, was not enough. It had to be coupled with supporting evidence from which the jury could reasonably find that such failure constituted the proximate cause of the accident. Miller v. St. Louis Public Service Company, 389 S.W.2d 769, 772 (Mo.1965), and Lovelace v. Reed, 486 S.W.2d 417, 419 (Mo.1972). The cab driver was under no duty to take any evasive action until he knew or in the exercise of the highest degree of care should have known that Betancourt was not going to obey the traffic signal light, but, instead, was going to proceed into the intersection. It was incumbent upon plaintiff to prove, when the cab driver knew or in the exercise of the highest degree of care should have known that Betancourt was not going to obey the traffic signal light, or when the car entered the intersection, that the cab driver had the time, distance, means and ability to avoid the collision. This plaintiff failed to prove, and, having failed to do so, she failed to make a submissible lookout case against appellant Schulthes. Submissibility and speculation are incongruous.

Judgment reversed.

All concur.