**Shelia GARBER, Plaintiff-Respondent,**

**v.**

**Amos SCOTT et al., Defendants,**

**Amos Scott and St. James A.M.E. Church, Defendants-Appellants.**

No. 35953.

Missouri Court of Appeals,
St. Louis District,
Division Four.

June 24, 1975.

Fitzsimmons & Fitzsimmons, Attorneys, Inc., Northcutt Coil, Clayton, for defendants-appellants.

Sommers & Holloran, Inc., James P. Holloran, St. Louis, for plaintiff-respondent.

NORWIN D. HOUSER, Special Judge.

Action for damages for personal injuries sustained by Shelia Garber when a motorcycle on which she was riding as a passenger was struck by a station wagon driven by Amos Scott in the intersection of Lindbergh Boulevard and Blake Avenue in St. Louis County. Plaintiff sued Scott, the church of which he was assistant pastor, and Daniel Holland, operator of the motorcycle. A jury returned a verdict for plaintiff for $25,000 against all defendants. From the judgment entered upon the verdict Scott and the church have appealed.

Appellants' first point is that the court erred in giving Instruction No. 2 submitting negligent failure to keep a careful lookout for the reason that the charge was not supported by substantial evidence.

Lindbergh Boulevard, a north-south 5-lane main trafficway, has three northbound lanes and two southbound lanes, separated by a 4-foot grassy divider strip, south of the intersection. Blake Boulevard has two eastbound lanes and one westbound lane, separated by a 4-foot median divider strip, west of the intersection, and one eastbound lane and two westbound lanes, separated by a 4-foot divider strip, east of the intersection. Traffic is controlled at the intersection by electric stop-and-go lights. Westbound traffic on Blake turns left (south) on the green light; there is no green arrow; and there is a sign requiring such traffic to yield to eastbound traffic on Blake. Lindbergh is 60–65 feet wide from east to west edge. Each lane is approximately 10 feet wide. The following diagram roughly presents the physical situation:

NORTH

LINDBERGH BLVD

EAST

BLAKE AVE

CHACKES

SCOTT

WEST

BLAKE AVE

LINDBERGH BLVD

X = POINT OF IMPACT

SOUTH

The *collision* occurred at 9 p. m. on September 8, 1971. It was dark. Street lights, vehicle lights and lights in stores in the vicinity were turned on. Visibility of cars

from every corner of the intersection to every other corner was good. The general lighting condition of the intersection was "bright"—admittedly good. Scott had "no trouble observing the entire intersection." The weather was dry and fair.

There was evidence from which the jury could have found the following facts: Holland, with plaintiff seated behind him, holding around his waist, approached the intersection on Blake, operating his motorcycle westwardly, intending to turn left (south) on Lindbergh. He brought the motorcycle to a stop at the intersection, because the red light was against westbound traffic. Immediately to his left, in the lane next to the divider strip, an automobile driven by one Chackes was also waiting for the light to turn green. The left-turn signal lights on both Holland's motorcycle and Chackes' automobile were blinking. Cater-cornered across the intersection, headed in the opposite direction (east) on Blake, also waiting for the light to change, was an automobile and next behind it was the station wagon driven by Scott. These two eastbound vehicles were in the south or outer lane of Blake.

Scott observed the blinking light on the Chackes automobile but did not see the blinking light on the motorcycle. When the traffic light changed from red to green each of the four vehicles above described moved forward. Chackes advanced halfway across the intersection, with little if any turning movement to the left or south, and then he stopped, yielding to eastbound traffic. The automobile in front of the station wagon moved into and out of the intersection. The motorcycle started forward, turning left in front of Chackes' stationary automobile, at a speed of 3 to 5 m. p. h. ("enough to keep balance") and continued south on Lindbergh at an undiminished speed of 3 to 5 m. p. h. The station wagon, which had stopped 26 feet west of the west curb line of Lindbergh extended, started forward, slowly accelerating as it entered

the intersection to a speed of less than 10 m. p. h. Scott was intending to cross Lindbergh and continue east on Blake. Neither driver saw the other in time to avoid a collision between the station wagon and the motorcycle. Although lighting conditions and visibility were good; although Scott saw the Chackes automobile move out and observed it come to a stop, and notwithstanding there were no obstructions to prevent Scott from seeing and he could have seen the motorcycle, Scott did not actually see the motorcycle or its riders at any time until the motorcycle was straight ahead in front of him, directly in his path, and only 3 feet away. He had passed the west curb line and had passed the entire first (western-most) lane of Lindbergh before he saw the motorcyclists. At that time the front end of the station wagon was a car length (16 feet) south and the same distance west of the front end of the Chackes automobile. The station wagon was in very good operating condition. It had good brakes, tires and steering. As soon as he saw the motorcyclists Scott immediately applied the brakes, which took ahold but too late to avoid a collision. The station wagon did not swerve; its horn was not sounded. The collision occurred in the southwest quadrant of the intersection, in the second lane from the west curb line of Lindbergh. The right front part of the station wagon collided with the right rear portion of the motorcycle, throwing its occupants off and seriously injuring plaintiff. The station wagon shoved the motorcycle five feet east of point of impact and came to rest with the motorcycle under its front part.

These facts form a sufficient basis for a jury finding that Scott failed to keep a careful lookout, as submitted in Instruction No. 2. "The proper test of failure to keep a careful lookout as a proximate cause is whether in the exercise of the highest degree of care the driver of the defendant's vehicle could have seen the other vehicle in time to have taken effective precautionary

action in avoidance." Marshall v. Bobbitt, Mo., 482 S.W.2d 439, 442. And see Heberer v. Duncan, 449 S.W.2d 561, 563 (Mo. banc 1970); Zalle v. Underwood, 372 S.W.2d 98 (Mo.1963). As Scott started up from a stopped position and followed the car in front of him, approaching and entering the intersection, he had the duty to exercise the highest degree of care and to maintain a careful and vigilant lookout ahead and laterally ahead, Gerdel v. Broccard, 428 S.W.2d 492 (Mo.1968); 4A Missouri Digest Automobiles, ▮ a duty "not relieved or excused by the fact that he [was] favored by a green light nor [did] that fact confer upon him an absolute right to proceed across the intersection regardless of the movement of other traffic, Collier v. St. Louis Public Service Co., Mo.App., 298 S.W.2d 455. While the duty of care is commensurate with the circumstances (one of which is the green light in his favor) he cannot rely solely on the 'go' signal or drive blindly into the intersection without looking. Collier v. St. Louis Public Service Co., supra; 60 C.J.S. Motor Vehicles § 360 b, p. 855. A motorist favored with a green traffic signal has the right to assume that *nonemergency* vehicles approaching on an intersecting street will obey the red light and stop, and to rely upon that assumption until he knows or by the exercise of the highest degree of care should know the contrary. Collier v. St. Louis Public Service Co., supra." Politte v. Miller, 301 S.W.2d 839, 842 (Mo.App.1957). A duty on the part of Scott to act arose when in the exercise of the highest degree of care he should have seen and realized that the motorcycle was likely to proceed into his path on the favored boulevard and that there was danger of collision. McAlister v. Urhahn, 492 S.W.2d 19 (Mo.App.1973); Tener v. Hill, 394 S.W.2d 425 (Mo.App.1965); 4A Mo.Dig.Automobiles ▮

▮ From Scott's testimony it is clear that at no time did Scott see the motorcycle as it approached his path; that as to the motorcycle Scott drove blindly into the intersection. No reason is shown why Scott failed to observe the oncoming motorcycle, with its left-turn signal blinking. Lighting conditions were good. Scott could see, and did see, other vehicles and objects. Scott saw the Chackes automobile, with its left-turn signal light blinking, enter the intersection and come to a stop. Scott admitted that he never did see the motorcycle prior to the collision, but did for the first time see the *motorcyclists* when they were in Scott's path, directly in front of him, only 3 feet away. Considering the evidence in the light most favorable to plaintiff, was there time and space left to Scott, after he should have seen the oncoming motorcycle and should have sensed the danger of collision, to have taken effective preventive measures to avoid the collision? The jury could not reasonably have found a duty on Scott's part to act while Holland was executing the left turn in front of Chackes. Had Scott observed this movement he would have been entitled to rely on the assumption that Holland would obey the red light confronting Holland, stop and yield to Scott. After completing the quarter circle left turn, however, Holland proceeded at a continuous speed in a direct course toward Scott's path, and sometime during that southern course it would have become reasonably apparent to a very careful driver observing the scene that there was danger of a collision. The jury reasonably could have found that after completing his left turn and starting south Holland drove the motorcycle at a consistent speed of 3–5 m. p. h. for a distance of at least 18 feet to point of collision. At the average of those two speeds, 4 m. p. h., the motorcycle would travel 6 feet per second. At 3 m. p. h., the more favorable speed, it would travel 4½ feet per second. This means that Holland's "southern drive" took from 3 to 4 seconds from the time it began until the collision occurred. Giving Scott ¾ second for reaction time (ample in view of his testimony that within a 3-foot space he reacted and applied brakes which took

ahold) leaves from 2¼ to 3¼ seconds within which Scott could have taken preventive action, if the danger of collision was apparent at the time Holland commenced his southern course. The jury could reasonably have found that Scott could have seen the motorcycle as it executed the left-hand turn and cut in front of Chackes' automobile and then proceeded toward Scott's path against the red light, without slackening speed; that it should have been apparent to Scott as the motorcycle started south without hesitating that the operator of the motorcycle did not intend to yield to Scott, thereby calling upon Scott for action in avoidance. The jury could also find that Scott had time and space within which to take effective precautionary measures. Scott's station wagon was in good mechanical condition. His brakes and steering apparatus were in good operating condition. Scott had stopped for the red light at a point 26 feet west of Lindbergh—34 feet west of the west line of the lane in which the collision occurred—some 38 feet west of the point of impact. Scott started to accelerate "some distance back of Lindbergh," but he accelerated *"slowly"* to "maybe ten, not over ten miles an hour" as he entered the intersection. Ten m. p. h. was the highest estimate of Scott's speed at any time before collision. There was some evidence that it was "less than" 10 m. p. h. Scott arrived at that speed slowly, from a standing stop. When Scott started forward there was one car ahead of him in his lane, which he followed at a distance of 10 feet. That car left the intersection. From the foregoing facts the jury could find that Scott was traveling less than 10 m. p. h. at the time when he could and should have seen the motorcycle and appreciated the danger . Traveling at 10: m. p. h. an automobile may be stopped "within a very short space." Davis v. Schroeder, 291 F. 47, 51 (8th Cir. 1923); Edwards v. Dixon, 298 S.W.2d 466, 469 (Mo. App.1957). At 10 m. p. h. an automobile travels 10.6 feet in the reaction time of ¾ second. An automobile with good brakes

traveling 10 m. p. h. can be stopped within 9 feet exclusive of reaction time, De Lay v. Ward, 364 Mo. 431, 262 S.W.2d 628 (banc 1953), and within 19.6 feet, including reaction time, or within 1.37 seconds after the occasion to stop arises. Edwards v. Dixon, supra. Scott had at least 2¼ to 3¼ seconds and between 15 and 20 feet within which to stop, after allowing for reaction time, but unfortunately he had not maintained the required lookout, as a result of which he did nothing until far too late. He did not know of the danger of collision until the last split second. Even so he had time to react, get his foot to the brake and for the brake to take ahold, according to his testimony, but a collision at that late time was inevitable. The jury not only could have found that the collision was avoidable by stopping within the time and distance available to Scott, but also could have found that had Scott kept a careful lookout, a collision could have been avoided if Scott had slowed down or swerved to the left. There were no other vehicles in the intersection. This is an "almost escaping" case. The impact took effect on the right front part of the station wagon and the right rear part of the motorcycle. The slightest diminution of speed or the slightest movement to the left would have avoided contact between the vehicles.

■ Appellants' second point is that the court erred in giving Instructions Nos. 3 and 10, authorizing a verdict against the church upon a finding of negligent failure of Scott to keep a careful lookout, and that Scott was operating the station wagon within the scope and course of his employment; that Scott's acts were within the scope and course of agency if performed to serve the interests of the church according to an express or implied agreement with the church, and the church controlled or had the right to control Scott's physical conduct. Appellants make this contention on the ground that there was no evidence that the church controlled or had the right to control his conduct at the time of the accident.

This point is without merit. While there was no testimony in terms reserving to the church control over or the right to control the acts of Amos Scott in the operation of the station wagon, those elements logically may be inferred from the following facts, which were in evidence: The station wagon belonged to the church. Scott was assistant pastor of the church, in charge of youth activities. His superior was the pastor. Scott customarily used the station wagon to do church business. He was on church business that evening. At the time of the accident Scott was on a mission to purchase baby clothes "for one of [his] people he was going to baptise"—for the child of one of the parishioners of the church. Scott was using the station wagon at the time with the approval of the pastor, who was out of town. When the pastor was out of town Scott usually kept the vehicle, it being his duty in the pastor's absence to "cover" all of the pastor's duties and responsibilities, such as visiting the sick, etc. The church allowed Scott $50 a month for transportation expenses. The right of the church, through its pastor, to control the means and manner of Scott's service to the church, and a manifestation by the church to Scott that he might act on the account of the church, and consent by Scott that he so act, inheres in this state of facts, within the meaning of the cases of Madsen v. Lawrence, 366 S.W.2d 413 (Mo.1963), and Wigger v. Consumers Cooperative Association, 301 S.W.2d 56 (Mo.App.1957), cited by appellant, and Leidy v. Taliaferro, 260 S.W.2d 504, 505 (Mo.App.1953), cited by respondent.

Judgment affirmed.

SMITH, C. J., and ALDEN A. STOCKARD, Special Judge, concur.