Troy Chad HOWARD, a minor, by Troy Howard and Marketta Howard, his wife, next friends;  and Troy Howard and Marketta Howard, his wife, individually, Plaintiffs-Respondents,

v.

Leroy LUNDRY, d/b/a Lundry's Custom Kitchens and Interior Home Center, Defendant-Appellant.

No. 11007.

Missouri Court of Appeals,
Southern District,
Division Three.

Nov. 27, 1979.

Motion for Rehearing or to Transfer to Supreme Court Denied Dec. 19, 1979.

Application to Transfer Denied
Jan. 15, 1980.

Harold B. Treasure, J. Michael Mowrer, Dalton & Treasure, Kennett, for plaintiffs-respondents.

J. Lee Purcell, Glenn E. Easley, Hyde, Purcell, Wilhoit, Edmundson & Merrell, Poplar Bluff, for defendant-appellant.

GREENE, Judge.

This case is a civil action for damages in which the jury's verdict, and the trial court's judgment, were in favor of plaintiff Troy Chad Howard on Count I of the petition in the sum of $50,000, and in favor of plaintiffs Troy Howard and Marketta Howard on Count II of the petition in the sum of $5,000. Defendant appeals. We affirm the judgment of the trial court.

Plaintiff Troy Chad Howard (Chad) is the minor child of Troy and Marketta Howard. Mr. Howard is a home builder in Kennett, Missouri. On March 14, 1977, he went to Lundry's Custom Kitchens in Poplar Bluff, Missouri, to buy some cabinet tops and to talk to Leroy Lundry, the owner of the cabinet shop, about purchasing some custom-made cabinets. Chad, who was 28 months old at the time, accompanied his father. The store contained a showroom

where built-in kitchen equipment was displayed. One of the items on display was a Chambers double oven. The oven weighed 175–180 pounds. It was mounted on steel runners and inserted into a wooden cabinet. The oven was not secured in the cabinet. There were holes in the interior of the oven for the express purpose of inserting wood screws through the oven into the cabinet to secure the oven in place, but Lundry had not used them, nor had he secured the oven in place by any other means. There was testimony at the trial that industry-wide practice and custom required that items, such as the oven, be secured in the display cabinet. This practice was for safety reasons.

Troy was talking to Lundry about buying some materials. Chad, who was an active child, had been walking and running around in the store. He was given a soft drink and a candy bar by Mrs. Lundry, who worked in the store. Chad went to the oven and tried to pull it open. The oven fell out, striking Chad on the left side of the head. Lundry and Troy rushed to the child. The oven was on top of Chad. Lundry removed the oven and Troy picked up his son. Chad had a "bad gash" on the left side of his head, part of his hair was pulled out, and he was bleeding from the right ear. His father took him to the emergency room at the Lucy Lee Hospital in Poplar Bluff, where he was given emergency treatment by Dr. Suvan, who was on call at the time. Chad vomited while in the emergency room. He was then taken by ambulance, at the instruction of Dr. Suvan, to the Children's Hospital in Memphis, Tennessee. Chad had a seizure while on the way to Memphis, vomited again, and his blood pressure went up. He was admitted to the hospital in Memphis and stayed there for 2 days. Chad did not sleep well in the hospital and would "grab" his head.

When Chad was discharged from the hospital, his parents took him home and placed him under the care of their family doctor, Charles Cash. Dr. Cash had delivered Chad. Chad had been seen in Memphis by Dr. James and Dr. Cordell and was examined in Popular Bluff by Dr. Graham a few weeks before trial, at the request of defendant's attorney.

After the accident, Chad began wetting the bed at night, stuttered a lot, and had difficulty standing. When Mrs. Howard ran the vacuum cleaner, Chad would hold his ears and cry. He was nervous, and complained about his ears and legs. Dr. James diagnosed Chad's primary injury as a basal skull fracture, which is a fracture of the bone at the base of the skull. X-rays showed soft tissue swelling in the area. He also said the bleeding from the right ear was caused by the trauma from the blow on the head of Chad. Dr. James referred the child back to his local physician, Dr. Cash, so that the progress of the child could be followed.

Dr. Cash testified that, after the accident, the child was nervous, irritable and frightened, and that his reflexes were exaggerated. He saw Chad 4 or 5 times. He saw Chad the day before trial, which was February 22, 1978, over 11 months after the accident. The child still had hyperactive tendon reflexes and ankle jerks at that time. In answer to a hypothetical question, he related the bed wetting, stuttering, nervousness, hyperactive reflexes and leg pains to the skull fracture. Chad's medical expenses totaled $762. In addition, Chad's parents made 5 trips to Memphis and incurred expenses of approximately $150, which trips were occasioned by Chad's injuries and treatment.

Defendant raises 5 points of error on appeal, which are that the trial court erred in 1) overruling defendant's motions for directed verdict filed at the close of plaintiff's evidence and at the close of all of the evidence for the reason that plaintiffs did not make a submissible case under the law, 2) giving erroneous verdict directing instructions, 3) admitting opinion evidence from Dr. Cash, 4) failing to grant defendant a new trial on the issue of damages for the reason that the verdicts were grossly excessive, and 5) overruling defendant's motion for remittitur.

## DID PLAINTIFFS MAKE A SUBMISSIBLE CASE UNDER THE LAW?

■ Defendant alleges, in his first point, that plaintiffs failed to make a submissible case at trial and that the trial court erred in overruling defendant's motion for directed verdict at the close of all the evidence. When determining whether or not a plaintiff has made a submissible case, the plaintiff's evidence is presumed to be true, any of defendant's evidence to the contrary is disregarded, and the plaintiff is given the benefit of all reasonable and favorable inferences drawn from the evidence. *Larrea v. Ozark Water Ski Thrill Show, Inc.*, 562 S.W.2d 790, 792 (Mo.App.1978).

■ The general duty owed a business invitee by a property owner is the exercise of reasonable and ordinary care in making his premises safe. *Albers v. Gehlert*, 409 S.W.2d 682, 684 (Mo.1966). A storekeeper is not an absolute insurer of the safety of his business invitees. The true ground of his liability is his superior knowledge of the dangerous condition and his failure to give a warning of the risk. *Bartling v. Firestone Tire & Rubber Co.*, 275 S.W.2d 618, 622 (Mo.App.1955). Thus, the standard of care, in Missouri, is that "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm." *Harbourn v. Katz Drug Company*, 318 S.W.2d 226, 228–229 (Mo.1958).

■ Conceding that Chad was a business invitee, defendant seeks to have this court apply the above standard to the evidence presented by plaintiffs. Defendant ignores, however, the fact that Chad was only 28 months old at the time of the accident. Where children are concerned, the exercise of ordinary care requires the exercise of more vigilance and caution than might be sufficient with respect to an adult. Conduct which might reach the standard of ordinary care with respect to an adult might, in the case of a child, amount to negligence or even gross negligence. Thus, ordinary care is a relative term, and the known characteristics of children must be taken into consideration in determining whether or not sufficient care for the safety of children has been exercised in a particular case. *Bronson v. Kansas City*, 323 S.W.2d 526, 531 (Mo.App.1959).

■ Looking at the evidence, in the light most favorable to plaintiffs, the jury could have found that the holes placed in the back of the oven by the manufacturer were to provide a means for securing the oven to the cabinet; that defendant was aware of the existence and the purpose of those holes, but chose not to fasten the oven to the cabinet; that the industry-wide practice was to fasten the oven in place; that the practice followed by defendant, although possibly adequate for the protection of adults, was not adequate for the protection of children; that the presence of patrons' children in defendant's store was foreseeable; that there was no way for the plaintiffs to know that the oven was not securely fastened; and that the failure of defendant to either secure the oven or to provide plaintiffs with sufficient warning of the potential danger in opening the oven was negligence. The evidence introduced by plaintiffs on the issue of liability was sufficient to make a submissible case for the jury. It was not, therefore, error for the trial court to refuse to direct a verdict in favor of defendant.

## THE INSTRUCTION ISSUE

Defendant, in his second point, alleges that the trial court erred in giving Instructions No. 2 and 4 on the grounds that those instructions submitted evidentiary facts to the jury and gave the jury a "roving commission" to speculate about the safety of

defendant's entire showroom, rather than limiting them to the question of the safety of the display oven.

Instructions No. 2 and 4 are identical with respect to their challenged paragraphs, which read, "Your verdict must be for the plaintiff(s) . . . if you believe: First, there was an unfastened oven in a display cabinet in the show room (sic) in defendant's store and as a result the show room (sic) was not reasonably safe for customers . . . ." Defendant claims that, since it was undisputed that the oven was "unfastened", the use of the term "unfastened" requires the finding of detailed evidentiary facts in violation of Rule 70.02(e). We conclude that plaintiffs have not included evidentiary facts in the disputed instructions.

■ From the beginning, plaintiffs have asserted that defendant's failure to fasten the display oven, contrary to industry-wide practice, made defendant's premises unsafe and directly led to the injuries suffered herein. There is no MAI instruction to cover the particular facts of this case. Plaintiffs, pursuant to Rule 70.02(e), chose to modify MAI 22.03 to fit the facts. In modifying the approved invitee instruction, they were required to set out the nature of the dangerous condition and to state that the condition made the premises unsafe. *Enloe v. Pittsburgh Plate Glass Company*, 427 S.W.2d 519, 525 (Mo.1968). Since plaintiffs maintained that it was the unfastened condition of the oven which constituted the dangerous condition, they were obligated to set that condition out in the modified instructions.

■ Although defendant has never denied that the oven, which fell on Chad, was unfastened, he has denied that the unfastened condition of the oven made his premises unsafe, and he has insisted, throughout trial and on appeal, that the oven was displayed in a safe manner. This was a jury issue. The jury chose to believe otherwise. We fail to see where it was improper for plaintiffs to submit the instructions in question. See *O'Connell v. Roper Electric Company, Inc.*, 498 S.W.2d 847, 856 (Mo.App. 1973). The instructions submitted by plaintiffs leave open the possibility that the jury could find that, although the oven was not fastened, defendant's premises were still safe for customers. Thus, the ultimate fact, to be decided by the jury, was not, "Was the oven unfastened?", but rather, "Did the unfastened oven make defendant's premises unsafe?" The challenged instructions correctly submit this issue to the jury.

Defendant also alleges that the use of the term "showroom" gives the jury a roving commission to speculate about the safety of his entire showroom. We disagree with this contention. The duty owed by a store owner to his customers is to maintain a safe "showroom" or "display floor". That is the area into which the customer is invited and that is the area which the owner must keep safe. The store owner is not asking customers to use the appliances displayed there, but merely to examine and inspect them. In so doing, his duty is to maintain the display items in a safe manner, and that duty extends to all items in the showroom.

■ Looking at the disputed instructions in their entirety, the use of the term "showroom" does not give the jury a roving commission to speculate about the safety of the entire showroom. The instructions adequately focus the attention of the jury on the condition of the display oven, which fell on Chad, and its effect upon the showroom area which defendant was required to maintain. Defendant's argument in favor of substituting the phrase "adequately secure the oven" in place of "fasten it", in the fourth paragraph of the challenged instructions, is without merit since the meaning of the two phrases is essentially the same.

### THE OPINION EVIDENCE

In his third point, defendant alleges that the trial court erred in allowing plaintiffs' medical witness to testify as to Chad's medical condition, since that opinion was based, in part, on inadmissible hearsay evidence related to the doctor by Chad's parents. The statements, about which defendant complains, were incorporated into the following hypothetical question presented

to Dr. Cash by plaintiffs' attorney. (The underlined portions indicate statements made by Troy and Marketta Howard concerning Chad's condition.)

"Q. All right, Now, Doctor, assuming that an infant, Troy Chad Howard, two years and four months old was <u>in good health, and had a normal speech pattern for his age; he did not wet the bed at night</u>; that on March 14, 1977 he had an oven fall on him. Assuming further that the oven struck him upon the head in the left parietal temporal region. And assume further that the child began bleeding from the right ear; that the infant vomited twice; that the child was seen at the emergency room at the Lucy Lee Hospital in Poplar Bluff, Missouri, that the child further was transferred by ambulance to the LeBonheur Children's Hospital in Memphis, Tennessee; and assuming further that he was admitted to the LeBonheur Children's Hospital on March 14, 1977; assuming further that he was released from the LeBonheur Children's Hospital on March 16, 1977, and released to the care of a local physician; and assume further that <u>since the release from the LeBonheur Children's Hospital the child has complained of leg pains and has started wetting the bed at night, and that the child now stutters; that upon being exposed to noises such as a household vacuum cleaner the child covers his ears with his hands and grimaces; and assuming further that this child often awakens at night and appears frightened; that after awakening from a nap he will scream that his legs hurt and that he will not stand and walk on his legs at that time</u>; and assuming further that the child has hyperactive knee jerks bilaterally; assuming those facts are true, do you have an opinion based upon reasonable medical certainty as to the cause of these conditions; do you have an opinion?"

▮▮▮▮ The general rule governing the testimony of a treating physician is set out in *Schears v. Missouri Pacific Railroad Company*, 355 S.W.2d 314, 317 (Mo. banc 1962).

"A physician, in stating his expert opinion on a patient's condition, may testify to what he personally observed and also to what the patient said (an exception to the hearsay rule) concerning his present, existing symptoms and complaints. However, he may not base his opinion on or testify to statements of the patient with respect to past physical conditions, circumstances surrounding the injury, or the manner in which the injury was received."

It is also well settled that an expert witness may base a competent opinion upon matters within his personal knowledge or observation, upon competent evidence in the case, or upon both. *Oesterle v. Kroger Grocery & Baking Co.*, 346 Mo. 321, 326, 141 S.W.2d 780, 782 (1940). Generally, an expert witness may state the reasons for his opinion, but when the reasons are based in part on hearsay, the proper way to present an expert's opinion is to present competent evidence of facts from a proper source and then submit those evidentiary facts to the expert in a hypothetical question along with other relevant matter. *Schears v. Missouri Pacific Railroad Company*, supra at 320. After carefully studying the record, we find no error in the hypothetical question presented to Dr. Cash.

Dr. Cash was not allowed to testify as to Chad's past history or present complaints based on statements made by Chad's parents to him. Prior to the hypothetical question, Dr. Cash testified only as to what he observed while treating Chad. Thus, the only question for review here is whether the testimony of Chad's parents, at the time of trial, was competent evidence which could be properly incorporated into the hypothetical question asked of Dr. Cash.

As part of plaintiffs' case, Troy Howard was asked on direct examination:

"Q. (by Mr. Mowrer) I will ask you to think back about the time period between Chad's birth and March 14, 1977, and I will ask you whether you remember any problems at all concerning Chad Howard during that time period?

A. No, sir. Chad Howard was potty trained; he walked and talked normal; he didn't have any physical problems.

Mr. Purcell: Now I object to that, the statement he had no physical problems and ask that it be stricken.

The Court: That portion of the answer may be stricken and the jury is instructed to disregard it."

Both defendant's objection and the trial court's ruling clearly show that Troy's statements about Chad's toilet training and speech and walking patterns were not objected to by appellant.

Troy Howard also testified, without objection, that Chad had stopped wetting the bed by the time of the accident, but that since the accident Chad has started wetting the bed again; that Chad has trouble with his legs and awakes from naps screaming and hollering and wanting his legs rubbed; that Chad now stutters; and that Chad grabs his head when he hears any kind of loud noise, like a vacuum cleaner. Marketta Howard testified, without objection, that Chad would wake up from a nap and cry about his legs, that running the vacuum cleaner would make Chad hold his ears and cry, and that when Chad would get off the commode, he wouldn't stand up. Since defendant neither specifically objected to this testimony by Chad's parents, nor preserved a running objection to any testimony by the Howards concerning Chad's condition, he has failed to preserve anything for review. *Federal Deposit Ins. Corp. v. Crimson*, 513 S.W.2d 305, 307 (Mo. 1974); *Stafford v. Lyon*, 413 S.W.2d 495, 498 (Mo.1967); Rule 84.13(a).

Reversal on this point, under the plain error rule, Rule 84.13(c), is not warranted in this case, since no manifest injustice or miscarriage of justice resulted from the admission of this testimony. The statements made by the Howards concerning Chad's behavior since the accident reflected personal observations and, by definition, were not hearsay. *State v. Harris*, 571 S.W.2d 443, 446 (Mo.App.1978). Their testimony concerning Chad's expressions of pain, under Missouri law, were admissible as original evidence. *Squires v. City of Chillicothe*, 89 Mo. 226, 230–231, 1 S.W. 23, 24 (1886); *Haile v. Metropolitan Life Ins.*

*Co.*, 96 S.W.2d 628, 629 (Mo.App.1936); *Estes v. Missouri Pacific Railway Company*, 110 Mo.App. 725, 731, 85 S.W. 627, 629 (1905); *Bragg v. City of Moberly*, 17 Mo. App. 221, 225 (1885). (Under the federal rules, the statements would be admissible as an exception to the hearsay rule. F.R.E. 803[3]) The testimony of Chad's parents was competent evidence, properly admitted, and there was no error in incorporating it into the hypothetical question.

## WERE EXCESSIVE DAMAGES AWARDED?

In his fourth point, defendant alleges that the trial court erred in failing to grant a new trial, on the ground that the jury's award to Chad and his parents was so excessive that it must have resulted from the bias, passion and prejudice of the jury. In the alternative, appellant argues in his fifth point that, at the very least, the jury's award to Chad should be reduced by $35,000 and the award to Chad's parents should be reduced by $4,000, by way of remittitur.

An appellate court will not determine bias and prejudice of the jury from the amount of the verdict alone. Some other basis for making a determination of bias and prejudice must be shown. *Webb v. Rench*, 476 S.W.2d 570, 572–573 (Mo.1972). Looking at the record, we find no showing of anything which might indicate bias and prejudice on the part of the jury. We therefore rule against defendant on point four.

As for the question of remittitur, there is no precise formula for determining whether a verdict is excessive. Each case must be decided upon its own facts. Consideration is given to the nature and extent of the injuries, diminished earning capacity, economic conditions, plaintiff's age, and a comparison of compensation awarded and permitted in cases of comparable injury (the rule of uniformity). The ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained. *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. banc

1978). In determining the issue of excessiveness of damages, the reviewing court must consider the evidence, and favorable inferences arising therefrom, that uphold the jury verdict, and disregard conflicting testimony and inferences. *Clark v. Portman*, 357 S.W.2d 728, 731 (Mo.App.1962). The court should further consider that it is primarily the function of the jury to fix the amount of damages and that a trial court, in overruling the motion for new trial, has approved the amount of the verdicts. *Joly v. Wippler*, 449 S.W.2d 565, 570 (Mo.1970). The jury's determination should not be disturbed "unless the amount is so grossly excessive that it shocks the conscience of the court." *Stimage v. Union Electric Co.*, 465 S.W.2d 23, 28 (Mo.App.1971).

Looking at the evidence, as outlined above, in a light most favorable to plaintiffs, it is clear that Chad was seriously injured when the oven fell upon him. Chad's problems had not completely cleared up in the 11 months between the accident and the time of trial. This fact alone constitutes some evidence of permanent damages and the need for continuing treatment and observation. Due to double-digit inflation and the ever decreasing value of the dollar, it is useless to try and compare the jury awards here with jury awards in like cases in the early 1970's and those prior to that time. The jury's damage awards were not so grossly excessive as to shock the conscience of the court and are supported by substantial evidence. We rule against defendant on point five.

The judgment is affirmed.

All concur.