Robert E. GARDNER and Lola M. Gardner, Respondents,

v.

Billy M. REYNOLDS and Coca–Cola Bottling Company, Appellants.

No. WD 41043.

Missouri Court of Appeals, Western District.

June 13, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 1, 1989.

Application to Transfer Denied Sept. 12, 1989.

Thomas R. Hill, Kansas City, for appellants.

Patrick Burwell Starke, Blue Springs, for respondents.

Before TURNAGE, P.J., and CLARK and FENNER, JJ.

FENNER, Judge.

Appellants, Billy M. Reynolds and Coca–Cola Bottling Company of Mid–America, Inc. (Coca–Cola), appeal a jury verdict against them and in favor of Respondents Robert E. Gardner and his wife, Lola M. Gardner. Appellants filed a Motion for New Trial which was denied by the trial court.

Robert Gardner's claim arose out of an accident involving his automobile and a truck owned by Coca–Cola which truck was driven by its employee Billy Reynolds.

The accident occurred on the morning of July 2, 1986, on Highway 7 in Blue Springs, Jackson County, Missouri approximately 400 feet south of Walnut Street. Highway 7 is the major north-south thoroughfare through Blue Springs. At the location of the accident herein, Highway 7 is a five lane roadway consisting of two northbound lanes and two southbound lanes separated by a left turn lane. The lanes of travel are each twelve feet wide and there are shoulders on each side of Highway 7 which are ten feet wide.

The weather on July 2, 1986, was hot, clear and sunny. Robert Gardner had just turned south onto Highway 7 from Walnut Street at the time of the accident traveling approximately 400 feet on Highway 7 prior to the time of impact. The Coca–Cola truck pulled from the southbound shoulder

of Highway 7 and the left front bumper of the truck collided with the passenger side of Robert Gardner's vehicle. The collision caused the Gardner vehicle to spin around ending up in the center lane facing north, the opposite direction Gardner had been traveling.

Robert Gardner was alone in his vehicle at the time of the accident and his cause of action was for injuries he alleged to have received therefrom. Lola Gardner's action was for loss of consortium.

## I. VERDICT NOT AGAINST WEIGHT OF EVIDENCE

Appellants raise six points on appeal. Points I and III argue that the verdict in favor of Robert Gardner in the amount of $470,000 was excessive and against the weight of the evidence.

A determination of whether a verdict is against the weight of the evidence is within the exclusive province of the trial court, and on appeal, the Court of Appeals does not weigh the evidence but determines whether sufficient evidence supports the verdict, considering the evidence in the light most favorable to the prevailing party below, giving that party the benefit of all reasonable inferences and disregarding the other party's evidence except as it may support the verdict. *Marshall v. Edlin*, 690 S.W.2d 477, 479 (Mo.App.1985). The question of whether or not a new trial should be granted on the ground that a verdict is excessive or inadequate is to determine if the verdict is against the weight of the evidence on that fact issue. *Bell v. Bell's Estate*, 368 S.W.2d 544, 545 (Mo.App. 1963).

■ It is primarily the function of the jury to fix the amount of damages and in overruling a motion for new trial a trial court approves the amount of the verdict. *Howard v. Lundry*, 591 S.W.2d 193, 201 (Mo.App.1979). The jury's determination of damages should not be disturbed unless the amount is so grossly excessive that it shocks the conscience of the court. *Id.*

■ There is no precise formula for determining whether a verdict is excessive;

each case must be considered on its own facts with the ultimate test being what fairly and justly compensates plaintiff for the injuries sustained. *Firestone v. Crown Center Redevelopment Corp.*, 693 S.W.2d 99, 108 (Mo. banc 1985).

Considering the evidence in the light most favorable to Robert Gardner supports the trial court's determination that the verdict was not excessive or otherwise against the weight of the evidence.

■ At the time of the accident, July 2, 1986, Robert Gardner was 75 years old. He had been retired from Remington Arms for approximately twelve years. Before his retirement, Robert Gardner had always been a hard worker, at times working two jobs. Following his retirement he continued to be a very active person. After he retired Robert Gardner worked with his son in his son's water proofing business. His son had contracted malaria in Korea and never seemed to totally recover and so his father would help out when needed. Robert Gardner also worked some at a filling station after his retirement.

At the time of his retirement, at age 63, Robert and Lola Gardner lived in the country on five acres of ground. Between the ages of 63 and 73 Robert Gardner worked on his five acres, he cleared brush by hand, mowed the property, built two small barns and built a fence. He raised quail, pheasants and chickens on the property. He maintained a garden which consisted of a strawberry patch of 28 rows that were each 135–140 feet long. He put a new roof on his house by his own labor. In addition to his outdoor activities, Robert Gardner did most of the household chores including cleaning, laundry and shopping due to the fact that his wife suffered physical ailments including hypertension and severe arthritis.

From the late 1970's until August of 1984, Robert Gardner would walk seven to ten miles a day, starting at 6:00 a.m., picking up aluminum cans along the highway. He would drag a large trash bag of cans he collected behind him as he made his walk.

Robert and Lola Gardner assisted their youngest daughter, Janet Heiple, who was thirty-eight at the time of trial and had lived with her parents off and on until 1984. Janet's son, Brett, also lived with the Gardners from the time he was six months old. In addition to Brett, the Gardners also raised another grandchild who was handicapped. The Gardners raised this grandchild from birth.

Up to the time the Gardners sold their property in the country, Robert Gardner played sports with his children and grandchildren including football, baseball and badminton.

The Gardners sold their property in the country in August of 1984. The property was sold to a developer who had attempted to persuade them to sell for the preceding two years. Robert Gardner's health was not a factor in their moving into town. When the Gardners moved into town, Robert Gardner was not limited in his activities and was not experiencing any health problems. In town Robert Gardner continued to do the yard work and the house work. He planted trees and shrubs and cut down trees with an ax and then used a chain saw to finish the cutting. He built a privacy fence, painted the trim on the house and caulked around the windows. He repaired walls in the house, laid linoleum and repainted the inside of the entire house. He finished the basement, put in a half-bath and remodeled all of the bathrooms.

After the accident on July 2, 1986, Robert Gardner's health changed drastically. After the accident he walked bent over and slow and he was always leaning on something. Robert Gardner had never been a complainer but after the accident he complained of being in pain. He was no longer able to work on his house or do any of the errands or housework that he once did. His grandson and daughter had to take over these chores. Mr. Gardner now requires a cane to walk and even has difficulty dressing himself. About all Robert Gardner is able to do since the accident is to sit or lay around at home, at times needing assistance to move from one room to another. There hasn't been a day since

the accident that Robert Gardner has not been in pain. Most of the time he stated that he is "hurting real bad" and lays on a heating pad to attempt to relieve the pain.

Prior to the accident on July 2, 1986, Robert Gardner was not experiencing any pain but immediately after the accident he had pain in his neck and back and his legs were numb and described by him as without any feeling. His legs have felt numb since the day of the accident.

On August 12, 1983, Robert Gardner was seen by a physician who referred to his health as excellent. In May of 1985, he was seen by a physician who described his health at the time as remarkably good.

Robert Gardner has been seen by a number of doctors since the accident. For nearly two years Robert Gardner underwent a variety of tests in an attempt to treat the injuries he sustained in the accident. He had physical therapy, drugs, heat treatment, medical and chiropractic attention.

Immediately after the accident Robert Gardner was taken by ambulance to the emergency room at St. Mary's Hospital. Mr. Gardner was not admitted to the hospital at that time. A few days later Mr. Gardner went to see his doctor, Dr. Pepple, in regard to his injuries and Dr. Pepple continued to treat Robert Gardner thereafter. Dr. Pepple, an internist, stated that in his opinion Robert Gardner suffers from soft tissue injuries to the neck and lower back which are the result of the July 2, 1986, automobile accident. Dr. Pepple stated that Robert Gardner's injuries are permanent and that he was not aware of any surgery or other treatment that would help to improve Mr. Gardner's condition. Dr. Pepple observed that Mr. Gardner experiences pain and struggles to move around. Dr. Pepple opined that Robert Gardner would not be able to do much of anything around the house.

Dr. Pepple referred Mr. Gardner to Dr. Ahmed, a neurologist. Dr. Ahmed stated that, in his opinion, Robert Gardner's low back problems stemmed from a ruptured disc in his low back, which was a perma-

nent injury that had been caused by the accident.

As part of his evidence Robert Gardner introduced the Mortality Tables as published in Chapter 442 of Vernon's Annotated Missouri Statutes and, without objection, asked the court to take judicial notice that a 77 year old man had a life expectancy of 10.56 years. Robert Gardner was 77 years old at the time of trial and 75 years old at the time of the accident.

Considering the evidence, as set forth herein in the light most favorable to Robert Gardner, it cannot be said that the trial court erred in failing to grant appellants a new trial based upon the verdict being excessive or otherwise against the weight of the evidence. Appellants' argument in this regard is denied.

## II. IMPEACHING JURY'S VERDICT

■ In appellants' second point it is argued that they were entitled to a new trial based upon evidence they presented which they claim established the jury's verdict was based upon mistake in considering the evidence and in fixing compensation. This argument rests upon the fact that after the jury returned its verdict, Coca–Cola hired an investigator to contact the jurors and interview them in regard to their verdict. Coca–Cola's investigator obtained affidavits from five of the jurors. In their affidavits the jurors stated that in considering the amount of damages to be awarded the Gardners, the jury considered what it would cost for the Gardners to be cared for in some form of extended care facility. The investigator testified that he was directed by Coca–Cola to make the specific inquiry as to whether or not the jury considered the need for extended care for Mr. Gardner. This evidence was received over the Gardners' objection that it attempted to impeach the jury's verdict.

As stated by the Missouri Supreme Court in *State v. Babb*, 680 S.W.2d 150, 152 (Mo. banc 1984), "the rule is perf:      ·ied that jurors speak through their       ind they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict."

■ The evidence presented by Coca–Cola's investigator was a blatant and clear effort to impeach the jury's verdict and respondents' objection thereto should have been sustained. Jurors are entitled to the respect and gratitude of the system that they serve. Jurors should not be subjected to interrogation and possible harassment by the parties to a cause in which they have served in an effort by any party to invade the sanctity of the jury room and impeach their verdict.

Appellants' argument that the jury's verdict was based upon mistake is denied.

## III. BIAS, PASSION AND PREJUDICE

In their next point, appellants argue that the trial court erred in failing to grant a new trial due to the verdict being based on bias, passion, prejudice and partiality in the jury's verdict. Appellants argue that there are two indicia of bias, passion, prejudice or partiality. First is the disparity between the verdict for Robert Gardner and the verdict for his wife, Lola Gardner. Second is the fact that the jury considered ten years of cost for institutional care for the Gardners.

Appellants' effort to impeach the jury's verdict with evidence of their having considered, in deliberations, the cost of institutional care and this court's disapproval thereof has been discussed above. This evidence was inadmissible and therefore is not to be considered.

The jury's verdict in favor of Robert Gardner was in the amount of $470,000.00 and their verdict in favor of Lola Gardner was in the amount of $12,500.00. Lola Gardner's claim was based upon loss of consortium.

■ A trial court may infer bias and prejudice from the size of the verdict alone; an appellate court may not. *Reynolds v. Arnold*, 443 S.W.2d 793, 801 (Mo.1969). At the appellate level, the defendants must first show some error or occurrence at trial sufficient to incite prejudice against them

and second that the evidence, when viewed in a light most favorable to plaintiff does not merit the verdict. *Smith v. Archbishop of St. Louis,* 632 S.W.2d 516, 524 (Mo. App.1982).

Appellants do not show any error or occurrence at trial sufficient to incite prejudice against them and as discussed under Point I of this opinion, viewed in a light most favorable to plaintiffs, the evidence supports the verdicts.

Appellants' argument that the jury's verdict was based on bias, passion, prejudice and partiality is denied.

## IV. MAI 17.04

Appellants next argue that the trial court erred by refusing their instruction under M.A.I. 17.04, the verdict directing instruction for failure to act after the danger of collision is apparent. Under this instruction, appellants sought to submit for the jury's consideration whether Robert Gardner "knew or should have known of the likelihood of a collision in time to have stopped, swerved, slackened his speed or sounded a warning but Plaintiff Robert Gardner failed to do so ..."

▮ In order to warrant submission of this instruction, evidence must be presented that the plaintiff had the means and ability to avoid a collision by doing each act described in the instruction. *Saupe v. Kertz,* 523 S.W.2d 826, 830 (Mo. banc 1975). Having the means and ability to avoid a collision include the existence of sufficient time and distance, considering the movement and speeds of the vehicles to enable the party charged to take effective action in avoidance. *Id.*

▮ This accident occurred when the Coke truck, driven by Billy Reynolds, began to pull across the highway from the shoulder and, not seeing Robert Gardner's vehicle, collided with it. There was no testimony as to where the two vehicles were when Billy Reynolds pulled onto the highway and there was no evidence of how far apart the two vehicles were when they actually began moving toward one another. Robert Gardner testified that he saw the Coke truck out of the corner of his eye as it was hitting him and that at that time he jerked the wheel of his car to try to get out of the way. This does not show that Robert Gardner could have acted earlier and it provides no information as to the distance between the vehicles or the time available when the danger of collision became apparent.

There is no evidence in the record to support a finding that Robert Gardner knew or should have known of the likelihood of a collision in time to have stopped, swerved, slackened his speed or sounded a warning to avoid the collision.

Appellants' claim that the trial court erred by refusing their instruction under MAI 17.04 is denied.

## V. MOTION FOR MEDICAL EXAMINATION

In their final point appellants argue that the trial court erred by denying their Motion for New Trial on the basis of their argument therein that the court erred in denying their pre-trial Motion for an Order of a Medical Examination and Testing of Robert Gardner by a neurologist. The record reflects that Robert Gardner submitted voluntarily to two examinations by appellants' medical expert and that upon consideration, by the trial court, of the Motion for an Order of Medical Examination and Testing, it was denied.

▮ Authority to order medical examinations are matters for the trial court's determination for good cause shown. *State ex rel. McCloud v. Seier,* 567 S.W.2d 127, 129 (Mo. banc 1978). The granting or denial of a motion for medical examination rests within the discretion of the trial court. *Grimm v. Gargis,* 303 S.W.2d 43, 48 (Mo.1957); *See also, Mullen v. Dayringer,* 705 S.W.2d 531, 536 (Mo.App.1985). The trial court's discretion will not be disturbed on appeal absent a showing of prejudicial error. *Enyart v. Santa Fe Trail Transp. Co.,* 241 S.W.2d 268, 270 (Mo. 1951).

▮ In addition to the two examinations that Robert Gardner had submitted to

voluntarily by appellants' medical expert, he had been examined by two other physicians one of whom was a neurologist. Furthermore, Mr. Gardner's x-rays were reviewed by yet another physician.

Appellants have not shown prejudice or an abuse of discretion by the trial court in denying their Motion for an Order of Medical Examination and Testing.

The judgment of the trial court is affirmed.

All concur.