## TOTAL ECONOMIC ATHLETIC MANAGEMENT OF AMERICA, INC., Appellant–Respondent,

### v.

### Bruce Evon PICKENS, Respondent–Appellant.

### No. WD 48712.

Missouri Court of Appeals, Western District.

April 18, 1995.

John J. Benge, David Smith, Benge & Smith, Kansas City, for appellant-respondent.

John E. Turner, Hanover & Turner, Kansas City, for respondent-appellant.

Before ULRICH, P.J. and KENNEDY and BERREY, JJ.

ULRICH, Presiding Judge.

This anticipatory breach of contract case arose from a representation agreement signed by Bruce Evon Pickens and Total Economic Athletic Management of America, Inc., d/b/a Team America, a Nebraska Corporation. That representation agreement was to allow Team America to act as Mr. Pickens' contract advisor in negotiating his National Football League player contract. However, before negotiations, Mr. Pickens engaged another contract advisor who actually negotiated the NFL player contract. The ensuing litigation resulted in a $20,000 judgment entered on a jury verdict for Team America and against Mr. Pickens.

Both parties appeal. In its appeal, Team America claims that the trial court erred in restricting argument on damages, in denying its motion for additur, and in overruling its motion for a new trial on damages only. In his cross-appeal, Mr. Pickens contends that the trial court erred in giving and refusing instructions. The judgment is affirmed.

## I MR. PICKENS' CROSS–APPEAL

Mr. Pickens' cross-appeal is considered first. The cross-appeal asserts that the instructions misadvised the jury on the existence of a binding agreement and on the measure of damages. The following facts provide background on the representation agreement:

While a student at the University of Nebraska, Bruce Evon Pickens played football for the University's football team, a perennial National Collegiate Athletic Association (NCAA) Division I football power. Howard Misle is the president and owner of Total Economic Athletic Management of America, Inc., a corporation incorporated in Nebraska,

d/b/a Team America. Mr. Misle apparently owns other businesses, including an automobile dealership in Lincoln, Nebraska. In behalf of Team America, Mr. Misle negotiates player contracts for athletes with professional football teams. Mr. Misle is a certified contract advisor by the National Football League Players' Association (NFLPA).

Trial evidence discloses that Mr. Misle and Mr. Pickens met when Mr. Pickens was a student at the University of Nebraska. On January 3, 1991, Mr. Pickens encountered Mr. Misle at Mr. Misle's automobile dealership. Mr. Pickens purchased a vehicle from the dealership, and Mr. Misle, in behalf of the dealership, advanced Mr. Pickens credit on a "house note." Mr. Pickens paid nothing for the automobile. Mr. Misle told Mr. Pickens that Mr. Pickens would be approached by many agents seeking to represent him in negotiations with a National Football League (NFL) professional football team to obtain a professional football player contract.

According to Mr. Misle's testimony, an agreement was signed by Mr. Pickens and Mr. Misle on January 18, 1991. The agreement bears the date January 20, 1991. Except for the deletion of paragraph 7, the agreement was a standard form entitled "Standard Representation Agreement Between NFLPA Contract Advisor and Player." Mr. Pickens was not given a copy of the document when it was signed.

Testimony differed about why the representation agreement was not dated when signed. Mr. Misle testified that he had inadvertently failed to date the agreement, and dated it sometime after the date the agreement was signed when he realized that failure. Mr. Misle also testified he explained to Mr. Pickens that sending the agreement to the NFLPA as provided in paragraph 7 was unnecessary because the organization was then a voluntary association and not a union. Mr. Misle also testified that he eventually gave a copy of the signed and dated document to Mr. Pickens.

Team America had representation agreements with other football players. Mr. Misle had sent those agreements to the NFLPA office as provided by paragraph 7 in the NFLPA form contract. In a letter submitted by Mr. Misle to the NFLPA office, he stated that as Team America continued to enter such agreements with athletes, he would submit copies of the agreements to NFLPA.

Mr. Pickens' testimony about signing the representation agreement differed from Mr. Misle's. Mr. Pickens stated that when he arrived home from the Orange Bowl game on January 3, 1991, an employee of Mr. Misle's automobile dealership was awaiting him at the airport. Mr. Pickens went to Mr. Misle's automobile dealership where he was shown several automobiles, including the vehicle that he chose. Mr. Misle provided the vehicle to him without Mr. Pickens' paying any money for its purchase. Mr. Misle then presented the NFLPA standard representation agreement saying to Mr. Pickens, "Since I'm putting myself out on a limb for you, why don't you show me a little bit of consideration and good faith by at least signing the document and letting me know that you are considering me for your agent." Mr. Pickens testified that Mr. Misle told him the document would not be dated and the agreement would not be binding until it was dated and sent to the NFLPA. According to Mr. Pickens, Mr. Misle stated that paragraph 7 of the agreement would be deleted because the document was not a binding agreement. Mr. Misle then stated to Mr. Pickens, according to Mr. Pickens, that when they reached agreement, the document would be dated and sent to the NFLPA to then become valid. Mr. Pickens then departed the dealership with the Audi automobile.

Sometime in early 1991, after Mr. Pickens and Mr. Misle signed the document at the automobile dealership, Mr. Pickens played in the East–West Shrine game. According to Mr. Pickens, sometime after the game a coach at Nebraska asked him if he had an agent, and when he replied that he did not, the coach suggested Tom Condon, a former Kansas City Chief professional football player and agent of numerous professional football players. Mr. Pickens met with Mr. Condon several times in Kansas City and in Lincoln. Mr. Pickens then signed a standard NFLPA representation agreement making Mr. Condon his contract advisor to negotiate

a professional football player contract with an NFL team.

Mr. Pickens testified that he spoke to Mr. Misle after he signed the agreement with Mr. Condon. He informed Mr. Misle that he had signed the agreement with Mr. Condon and that he had decided that Mr. Condon would be his agent. Mr. Pickens informed Mr. Misle that he would return the Audi automobile, and would reimburse Mr. Misle for the money he periodically extended to him after January 18, 1991. The money consisted of numerous checks and goods totaling more than $2,900. The money and the automobile were provided to Mr. Pickens when he was a student at the University of Nebraska in 1991.

NCAA rules preclude giving things of value to athletes when they are undergraduates. Additionally, the NFLPA precludes giving athletes anything of value to induce them to sign an NFLPA representation agreement.

The Atlanta Falcons professional football team drafted Mr. Pickens. He was the number three selection in the first-round draft selections. Tom Condon conducted the negotiations. The Atlanta Falcons initially offered $2,700,000 in three one-year player contracts. Mr. Condon eventually negotiated five one-year contracts which Mr. Pickens signed on October 5, 1991. Those NFL player contracts for the 1991, 1992, 1993, 1994, and 1995 football seasons provided for total compensation and work-out bonuses of $4,100,000 and other incentive bonuses. Mr. Pickens' entitlement to compensation under each player contract depended on his making the Atlanta Falcons team for that year. The NFL player contracts also provided for a guaranteed signing bonus of $2,492,000 payable over five years.

### ISSUES

■ Mr. Pickens' six points on cross-appeal relate to giving or refusing instructions. Nevertheless, the argument portions supporting Points I, III, V, and VI neglect to set out the text of the instructions as required by Rule 84.04(e). Points relating to instructional error are not preserved for appellate review when the contested instructions are not set forth in full in the argument portions of

the brief. *Woodiel v. Barclay Enterprises, Inc.*, 858 S.W.2d 247, 253 (Mo.App.1993). In addition, the theory advanced in Point I differs from that advanced in the corresponding argument. That variance also violates Rule 84.04(e) which requires the argument to substantially follow the point. *Missouri Highway & Transp. Comm'n v. Taylor*, 839 S.W.2d 676, 679 (Mo.App.1992). Consequently, the improperly preserved points will be reviewed for plain error only under Rule 84.13(c).

### I(A): The Verdict Director

■ In Point I, Mr. Pickens challenges the verdict director, Instruction 5, arguing that it improperly assumed facts in issue. Modeled in part on MAI 26.06, Instruction 5 provided:

Your verdict must be for plaintiff if you believe:

First, plaintiff agreed to serve as defendant's contract advisor in contract negotiations between defendant and a NFL club, and defendant agreed to allow plaintiff to be his contract advisor and to pay plaintiff a percentage of his NFL player contract, and

Second, plaintiff was ready, willing and able to perform plaintiff's duties as defendant's contract advisor, and

Third, defendant failed to perform his agreement, and

Fourth, plaintiff was thereby damaged.

According to Mr. Pickens' argument, the verdict director confused the jury by assuming the validity of the agreement. He asserts that the words "agreed" and "agreement" conveyed to the jury the existence of a "binding agreement" with a "meeting of the minds" when evidence showed the invalidity of the agreement. He argues that, because the validity of the agreement was in issue, the verdict director improperly hypothesized that the agreement was binding.

Mr. Pickens fails to demonstrate either prejudicial or plain error. MAI 26.06 provides the pattern verdict director when the existence, terms, and breach of a contract are disputed. *James O'Brien & Assocs., Inc. v. American Sportsman Travel, Inc.*, 819

S.W.2d 62, 64 (Mo.App.1991). Here, the verdict director was properly patterned on MAI 26.06 by following the approved language in hypothesizing that "plaintiff *agreed* to serve as defendant's contract advisor ... and defendant *agreed* to allow plaintiff to be his contract advisor...." Contrary to Mr. Pickens' claim, the verdict director did not assume a binding agreement; it required the jury to determine the existence of a binding agreement by finding that *both* plaintiff and defendant had *agreed.* Further, the trial court submitted at Mr. Pickens' request a true converse instruction[1] that reiterated each paragraph of Team America's verdict director. Under the circumstances, Mr. Pickens fails to establish that Team America's verdict director resulted in prejudice or manifest injustice. Point I is denied.

### I(B): Affirmative Converses

Mr. Pickens' Points II, III, and VI concern the refusal of his proposed, alternative affirmative converse instructions.[2] Although the trial court refused to submit any affirmative converse, it submitted the true converse noted above, and allowed argument on the matters presented in the rejected converse instructions.

Points II and III relate to proposed Instructions H and G:

#### Instruction H

Your verdict must be for defendant if you believe plaintiff and defendant agreed to be governed by the NFLPA code of conduct and that the written agreement was thereafter not sent to the NFLPA.

#### Instruction G

Your verdict must be for defendant if you believe that the NFLPA code of conduct for contract advisors was incorporated into the agreement between plaintiff and defendant and if you further believe

that plaintiff failed to comply with the provisions of that code of conduct.

Mr. Pickens maintains that his proposed affirmative converse Instructions H and G were appropriate because the verdict director failed to hypothesize contested issues of whether the NFLPA regulations were a part of the agreement and whether the NFLPA regulations had been complied with. Mr. Pickens submits that those affirmative converse instructions were supported by the evidence: (1) Paragraph 7 of the agreement form provided for submission of the completed agreement to the NFLPA; (2) Paragraph 7 of the agreement signed by Mr. Misle and Mr. Pickens had been crossed out; (3) Mr. Pickens testified that the agreement was not to be binding until dated and submitted to the NFLPA.

In Point VI, Mr. Pickens claims error in refusing Instruction C:

#### Instruction C

Your verdict must be for Defendant if you believe that the Plaintiff provided or offered to provide anything of significant value to Defendant in order to become the member contract advisor for the Defendant.

He contends that this affirmative converse instruction properly submitted the defense of illegality of the agreement. Arguing evidentiary support for Instruction C, Mr. Pickens points to testimony that Mr. Misle had provided him with an automobile to induce him to sign the agreement.

The approved method of conversing an issue in the verdict director is to use a true converse. *Hiers v. Lemley,* 834 S.W.2d 729, 735 (Mo. banc 1992). Although not favored, an affirmative converse is appropriate when the verdict director assumes as true or omits a disputed ultimate issue. *Id.* The facts hypothesized in an affirmative converse must be sufficient to defeat the plaintiff's

---

1. A *true converse* begins with "Your verdict must be for the defendant unless you believe ..." and continues with one or more propositions taken from the verdict director. MAI 33.01 (1991).

2. An *affirmative converse* begins with "Your verdict must be for defendant if you believe ..."

and continues with a hypothesized ultimate issue, which, if true, would defeat plaintiff's claim. MAI 33.01 (1991). Use of an affirmative converse instruction, unlike a true converse instruction, requires independent evidence to support it. *Id.*

claim and must be supported by independent evidence. *Id.* at 734. An affirmative converse should hypothesize only those facts that submit an ultimate issue and should avoid submission of unnecessary evidentiary facts. *Duncan v. First State Bank of Joplin,* 848 S.W.2d 566, 568 (Mo.App.1993). Yet no precise, universally accepted definitions differentiate "evidentiary facts" from "ultimate facts." *Id.* at 569. Consequently, determining what ultimate facts must be submitted and what evidentiary facts must be excluded depends on analyzing the theory that the proponent of the affirmative converse relies on. *Id.*

Here, Mr. Pickens, as proponent, fails to demonstrate the propriety of his proposed affirmative converse instructions. His entitlement to an affirmative converse depends on showing (1) that the verdict director assumed as true or omitted a disputed ultimate issue, *Hiers,* 834 S.W.2d at 735, and (2) that the facts hypothesized in the affirmative converse were ultimate facts, *Duncan,* 848 S.W.2d at 568. Mr. Pickens' claim that the verdict director assumed disputed facts was rejected in Point I. Mr. Pickens fails to show how or why the facts hypothesized in Instructions H and G would have defeated Team America's claim of anticipatory breach of contract. He also fails to explain the theory underlying Instructions H and G that hypothesized facts on the applicability of and compliance with NFLPA regulations. Those failures hinder determining whether the facts submitted an ultimate issue or involved evidentiary facts. The facts in Instructions H and G appear to be evidentiary facts because those facts apparently refute the agreement propositions in the verdict director. Evidentiary facts are appropriately presented in argument to the jury, but are not properly submitted in an affirmative converse.

■ Similarly, Mr. Pickens fails to demonstrate that the facts in Instruction C would have defeated Team America's claim on the ground of illegality. The facts hypothesized in Instruction C concerned offering things of value to induce the agreement. Mr. Pickens makes no showing that those facts, even if found true, rendered the subject matter of the agreement illegal under either Missouri or Nebraska law.

Accordingly, no error, plain or otherwise, resulted from rejecting Mr. Pickens' alternative affirmative converse instructions. In this situation, the trial court appropriately allowed argument on the disputed matters; submitted the true converse, the approved method; and rejected the affirmative converses, the less favored method. Points II, III, and VI are denied.

### I(C): Damage Instructions

■ In his Points IV and V, Mr. Pickens argues error in instructing the jury on damages. The trial court submitted Team America's Instruction 7 based in part on MAI 4.08:

### Instruction 7

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe is the sum which would have been due plaintiff under the agreement.

The court in turn refused Mr. Pickens' proposed Instruction B based in part on MAI 4.04:

### Instruction B

If you find in favor of plaintiff, then you must award plaintiff the reasonable value of the services furnished.

Asserting error in giving Instruction 7 and in refusing Instruction B, Mr. Pickens contends that the proper measure of damages was quantum meruit, *i.e.,* the reasonable value of the services furnished. Maintaining the propriety of instructing on quantum meruit, Mr. Pickens analogizes the agreement in this case with an attorney-client contract for a contingency fee. He asserts that the analogy is appropriate because both agreements involve contingent fees and fiduciary relationships. In support, Mr. Pickens cites *Plaza Shoe Store, Inc. v. Hermel, Inc.,* 636 S.W.2d 53, 60 (Mo. banc 1982), which limited the recovery of an attorney discharged from a contingent fee contract to the value of the services rendered.

■ Mr. Pickens' claimed entitlement to a damage instruction based on quantum meruit is unfounded. When the principal

wrongly terminates an agency agreement, the agent may either sue in quantum meruit for the commissions due or sue for breach of contract for the commissions that would have been earned under the agreement. 3 C.J.S. *Agency* § 465 (1973). Breach of contract and quantum meruit represent two separate causes of action that have different measures of damages. *See Berra v. Papin Builders, Inc.,* 706 S.W.2d 70, 71 (Mo.App.1986). The verdict director and the corresponding damage instruction must relate to the same cause of action. *See Hall v. Cooper,* 691 S.W.2d 507, 510 (Mo.App.1985). Consequently, submission of a breach of contract verdict director and a quantum meruit damage instruction would result in prejudicial error. *Id.* at 509.

No error resulted from submitting the damage instruction based on breach of contract. In its amended petition, Team America, as a wrongfully-terminated agent, pleaded anticipatory breach of contract and sought damages based on the provisions of the representation agreement with Mr. Pickens. Team America proceeded on a breach of contract theory. The trial court submitted to the jury a verdict director and a damage instruction modeled in part on the breach of contract pattern instructions in MAI 26.06 and 4.08. The damage instruction submitted, therefore, was consistent with the cause of action pleaded and proved.

Further, Mr. Pickens' reliance on the *Plaza Shoe* holding is unavailing. That holding is restricted to actions to enforce attorneys' liens by attorneys employed under contingent fee contracts and discharged without cause; it should not be extended to contracts in ordinary trades. *Plaza Shoe,* 636 S.W.2d at 56. Points IV and V are denied.

## II TEAM AMERICA'S APPEAL

Team America's appeal asserts the inadequacy of the $20,000 damage award for the anticipatory breach of the representation agreement. Consideration of Team America's points on appeal will deviate from the order presented in the briefs. The following facts are pertinent to damages:

In engaging a contract advisor, Mr. Pickens first signed an agreement with Howard Misle of Team America; Mr. Pickens then signed an agreement with Tom Condon. Mr. Misle and Mr. Condon had different backgrounds and experiences with negotiating NFL player contracts. Mr. Misle worked as an automobile dealer and a sports advisor. While working with another sports advisor, Mr. Misle negotiated for four or five NFL players in 1989. After obtaining certification as an NFLPA contract advisor and incorporating Team America, Mr. Misle negotiated contracts for eight to ten players. On the other hand, Mr. Condon had played football for the Kansas City Chiefs for eleven years. He was a licensed attorney. He served as president of the NFLPA for three years. As a certified NFLPA contract advisor, Mr. Condon had represented in contract negotiations with NFL teams over 200 NFL football players and numerous first-round draft selections.

The representation agreement signed by Mr. Pickens and Mr. Misle set the compensation for successfully negotiating an NFL player contract. Under that representation agreement, Team America, as contract advisor, was to receive four percent of all money received by Mr. Pickens under his NFL player contracts, excluding honor bonuses and honor incentives. At trial, the jury was instructed to award Team America such sum as it believed to be the sum which would have been due Team America under the representation agreement.

To prove damages Team America offered evidence of the NFL contracts that Tom Condon had actually negotiated for Mr. Pickens. Those NFL player contracts guaranteed Mr. Pickens signing bonuses of $2,492,000 and compensation for each season that he made the team. Mr. Pickens was required to qualify for the Atlanta Falcons team each year to receive compensation for that year. The following table shows the negotiated compensation and work-out bonuses under each contract:

| 1991 | $ 450,000 | Received |
| 1992 | $ 675,000 | Received |
| 1993 | $ 775,000 | Not Received |
| 1994 | $1,000,000 | Not Received |
| 1995 | $1,200,000 | Not Received |
| TOTAL | $4,100,000 | |

At the time of trial in 1993, Mr. Pickens had played football for the Atlanta Falcons during the 1991 and 1992 seasons and had been compensated for those seasons. At trial, Mr. Condon testified that Mr. Pickens would become a team member of the Atlanta Falcons Football Team in the 1993 season.

## II(A): Restricting Argument on Damages

In Point II D, Team America contends that the trial court erred by not allowing it to claim damages based on Mr. Pickens' compensation for the 1994 and 1995 football seasons. This point is improperly preserved for appellate review because its corresponding argument lacks references to the transcript pages where the trial court's ruling occurred. The failure to provide page references to the record on appeal violates Rule 84.04(h). *Nishwitz v. Blosser*, 850 S.W.2d 119, 123 (Mo.App.1993).

Apparently, the trial court restricted Team America's argument on damages to a percentage of Mr. Pickens' contracts for the 1991, 1992, and 1993 football seasons. Because the contracts were contingent on Mr. Pickens' becoming a team member the year each contract was applicable, the trial court found this condition precedent and fruition of the 1994 and 1995 contracts was uncertain. In arguing damages for lost commission, Team America was apparently restricted to asking for four percent of $4,392,000 (Mr. Pickens' signing bonus and his compensation under the 1991, 1992, and 1993 contracts). Team America was not allowed to include for consideration on the issue of damages Mr. Pickens' compensation under the 1994 and 1995 contracts.

Asserting error in restricting the damages argument, Team America analogizes its damages with damages for loss of anticipated profits. Team America then submits that anticipated profits are recoverable when made reasonably certain by proof of actual facts. In support of its analogy, Team America maintains that Mr. Pickens was reasonably certain to make the team in 1994 and 1995. Team America stresses that Mr. Pickens had made the team in 1991 and 1992, that evidence showed that he would make the team in 1993, and that the Atlanta Falcons issued the 1994 and 1995 contracts believing Mr. Pickens would make the team. In addition, Team America points to the lack of evidence showing that Mr. Pickens would not make the team in 1994 and 1995.

Although damages need not be absolutely certain, the existence and amount of damages must be reasonably certain and not speculative. *Aluminum Prod. Enter., Inc. v. Fuhrmann Tooling & Mfg. Co.*, 758 S.W.2d 119, 121 (Mo.App.1988). Here, the representation agreement provided that Team America's commission would be based on the amounts that Mr. Pickens actually received. Contingencies controlled Mr. Pickens' right to receive compensation under each signed NFL player contract. The inferences from the evidence cited by Team America fail to adequately establish occurrence of the requisite contingencies. Because no evidence established with reasonable certainty that Mr. Pickens would qualify and become a member of the Atlanta Falcons Football Team in 1994 and 1995, his fulfillment of the contracts for those years was uncertain and speculative. No error resulted from restricting the argument on damages. Point II D is denied.

## II(B): Alternative Motion For Additur

In Points I and II, Team America argues that the trial court erred in denying its alternative motions for additur and for a new trial on damages. It insists that the damage award of $20,000 is inadequate.

Legislatively revived by § 537.068, RSMo 1994, additur allows the trial court to condition denial of a new trial on the defendant's consent to increase the amount of the judgment. *Bishop v. Cummines*, 870 S.W.2d 922, 923 (Mo.App.1994). Before considering additur, the court must find that a new trial on damages is warranted. *Tucci v. Moore*, 875 S.W.2d 115, 116 (Mo. banc 1994). Here, the denial of additur is not amenable to appellate review because the trial court denied Team America a new trial on damages. *Cf. Stivers v. Ebert*, 887 S.W.2d 393 (Mo. banc 1994). (Grant of additur was error because defendant was not given option to consent to it or to have a new trial). Team America's Point I is denied.

### II(C): Alternative Motion For A New Trial On Damages Only

 In Point II, which addresses the denial of a new trial on damages, Team America contends that the damage award of $20,000 was against the weight of the evidence. Ordinarily, an appellate court will not interfere with the denial of a new trial on damages on the ground that it is against the weight of the evidence. *Gardner v. Reynolds,* 775 S.W.2d 173, 175 (Mo.App.1989). Fixing the amount of damages is a jury matter that is subject to the trial court's authority to determine whether the damage award is against the weight of the evidence. *Williams v. Funke,* 428 S.W.2d 11, 17 (Mo. App.1968). By denying a motion for new trial on damages, the trial court approves the jury's damage award. *Gardner,* 775 S.W.2d at 175. Weighing evidence is a trial court function; determining the sufficiency of the evidence is an appellate court function. *Id.* Consequently, an appellate court will not disturb the *denial* of a new trial on damages unless the ruling reflects a clear abuse of the trial court's discretion and the damage award appears grossly unwarranted. *See id.; Williams,* 428 S.W.2d at 17.

Arguing error from the denial of a new trial on damages, Team America asserts that the jury either made a mistake in calculating damages or disregarded the instruction on damages. Team America insists that its damages were determinable by the formula in the representation agreement entitling it to four percent of all money received by Mr. Pickens under his NFL player contracts. Team America sets Mr. Pickens' minimum receipts at $2,700,000, which represents the opening offer made by the Atlanta Falcons in negotiating the NFL player contract with Tom Condon. Team America also notes that under the contract actually negotiated, Mr. Pickens was guaranteed to receive $4,392,-000, which represents his signing bonus of $2,492,000 plus compensation of $1,900,000 for the 1991, 1992, and 1993 seasons. According to Team America's calculations, the jury should have awarded damages of $108,-000 ($2,700,000 × 4%) or $175,680 ($4,392,000 × 4%).

Countering, Mr. Pickens contends that the $20,000 damage award was within the range of the evidence presented to the jury. He contends that Team America's damages were not solely determinable by mathematical formula. He maintains that the damage evidence included matters other than the amounts actually negotiated by Tom Condon under the NFL player contracts. Stressing that Team America did not negotiate the NFL player contracts, Mr. Pickens contends that Team America was required to establish what it would have negotiated. Mr. Pickens asserts that the disparity between the experience of Mr. Misle and Mr. Condon demonstrated that Mr. Misle would not have been as successful as Mr. Condon in negotiating the contracts.

In reply, Team America asserts that it proved it would have negotiated NFL player contracts as favorable as those negotiated by Mr. Condon. In support, Team America points to Mr. Pickens' selection as number three in the first-round draft. As additional support, Team America points to evidence that Mr. Pickens' average annual compensation fell between those of the number two and the number four first-round draft choices. Team America emphasizes that, to award only $20,000 in damages, the jury would have had to determine that Mr. Misle would have negotiated a NFL player contract of only $500,000.

 The party seeking damages bears the burden of producing all relevant facts showing the extent of the damages. *Gasser v. John Knox Village,* 761 S.W.2d 728, 731 (Mo.App.1988). If a damage award is within the range of the evidence, a jury's verdict is not erroneous although the amount is not precisely in accordance with the evidence of either party. *DeLong v. Hilltop Lincoln–Mercury, Inc.,* 812 S.W.2d 834, 841 (Mo.App.1991).

 In the context of professional sports, the player's breach of an agency agreement does not necessarily entitle the agent to commission. JOHN C. WEISTART & CYM H. LOWELL, THE LAW OF SPORTS § 3.18 (1979). Technically, the agent is only entitled to damages for breach of contract, *i.e.,* the value of the promised performance re-

duced by any expenses saved. *Id.* In addition, the agent is entitled to his commission only if he can show that, had he been permitted to continue performance, he would have been able to consummate the contracts upon which he claims commission. *Id.*

Contrary to Team America's assertions, it was not entitled to commissions based solely on the contracts negotiated by others. Although required to show what it would have negotiated, Team America points to no evidence showing its own past achievements in negotiating NFL player contracts. The jury was instructed to award Team America such sum as it believed to be the sum which would have been due Team America under the representation agreement. In determining damages, the jury could consider all evidence, including the contracts negotiated by others, and the backgrounds and experiences of the negotiators. Here, the $20,000 damage award appears to be within the range of the evidence, and is not unwarranted. The trial court's denial of a new trial on damages was not a clear abuse of discretion. Team America's Point II is denied.

### Conclusion

Team America's appeal and Mr. Pickens' cross-appeal present no grounds for reversing the trial court's judgment. The judgment is affirmed.

All concur.